At the present term, the opinion of the Court, was delivered by
Fosd, J.
An indictment was'found by the grand jury of the county of Morris, against Robert Lash, that he being a married man, committed adultery with B. a single woman. This indictment being brought into this Court by Certiorari, the defendant moves that it may be quashed, because the facts on the face of it amount only to fornication, for which he might be lawfully indicted, but do not amount by the common law, to the crime of adultery. If a married man have illicit intercourse with a single woman, there is no doubt but he is guilty of adultery, according to the Ecclesiastical or canon law of the Church; but according to the common law, which is our constitutional guide, I hold it to be demonstrable, that adultery cannot be committed with a single woman; that an illicit intercourse with a single woman can only produce a nullius films, a bastard in law, who possesses no inheritable blood, is incapable of succeeding to any man’s inheritance, and whom she cannot impose as a legitimate heir upon her husband, for she has none, and consequently cannot occasion an adulteration of issue.
Neither fornication nor adultery were indictable offences at the common law; they were held to be only private wrongs, for which the aggressor was answerable in a civil action, for exemplary damages; and this continued to be the case, except for one short revolutionary period of time in England, until our own legislature made them indictable offences. For these enactments, we need go no further back than the year 1799, Revised Latos, 248; the 14th section whereof enacts, “ that every person who shall commit adultery, shall be punished by fine not exceeding one hundred dollars or imprisonment not exceeding six months; ” and the 15th section, “that every person who shall commit fornication, shall be punished by a fine of fourteen dollars; ” not defining what shall constitute adultery, or what shall constitute fornication ; leaving each to be determined by reference to the *385 common law, as I apprehend; but ever since the date of that statute, at least, which is upwards of forty years ago, professional men have differed about what adultery is; and what seems very surprising is, that the question has never been before the Supreme Court, for adjudication, till the present time. This difference arose from opinions being founded on codes of law materially different from each other; one side relying on that code which is called the common law; the other side on a code denominated the canon law, compounded of the civil or imperial law of Rome, interwoven with the laws of the church, and introduced by the Pope and his clergy into their Ecclesiastical Courts. Each of these codes held a different doctrine from the other, about what constituted adultery ; and we must first settle by which of those codes, we, sitting as a Court of common law, are to be guided; and I have no hesitation in saying that the common law is our constitutional guide.
The canonical law is not adopted in the written constitution of New-Jersey. The Popish clergy those zealous abettors of arbitrary power, during the time they sat as the only Judges in the Ecclesiastical Courts and the Court of Chancery, naturally introduced into them, the imperial laws of Rome; not only as to the mode of proceeding without a jury, but the maxims and principles established in the rescripts of emperors, decrees of general councils, opinions of the ancient fathers of the church, and decretal epistles of the Popes. But the common law was so favorable to the liberties ©f the nation, and consequently dear to the people, that their utmost zeal could never introduce these principles into the Courts of the common law; wherefore refusing to sit any more as Judges in the Temporal Courts, but retaining the Court of Chancery and Ecclesiastical Courts in their own'hands, they so enlarged their jurisdictions beyond the immediate cares of religion, as to engross the cognizance of many secular concerns; such as the probate of wills; granting letters of administration and guardianship; the settlement and distribution of the estates of persons deceased; deciding on the legality of marriages; and the power of divorcing for adultery. In settling what should constitute this charge, they deemed it almost heresy to take the common law for their guide, which law limited it to criminal intercourse with another man’s wife, *386 exposing his issue to adulteration, and a spurious heir to succeed bv law, at his death, to the inheritance of his estate; whereby it was strongly connected with the law of landed estates, and the doctrine of descents. But these worldly and temporal considerations were quite below their Ecclesiastical notions. They decreed under the authority of the Pope as their sovereign leader and supreme head, that marriage was a holy sacrament, as holy as baptism and the memorial of our Saviour’s death; that its voids were holy, and the breach of them, was adultery in any person who had once assumed them. Therefore they held that if a married man had illicit intercourse with a single woman, the violation of his vows, made him guilty of adultery ; for which cause his wife might sue for divorce; and this doctrine of the Ecclesiastical law has prevailed in Chancery from those popish times, to the present day. It views the act merely in 'the light of a sin ; a breach of vows, assumed by the church to be holy, and without any reference to the inheritance of estates, or the laws relating to the purity of heirship and descents. If it were necessary to vindicate the common law, it would be easy to shew the fallacy of the foundation on which the opposiLe doctrine rests; for the assumption that marriage is a sacrament which renders its vows all holy, is entirely a papal superstition; it being only a solemn civil contract, and so acknowledged by our laws. If a single man have unlawful intercourse with a married woman, whereby her husband may be imposed upon by a spurious heir, he is guilty of adultery, by the common law; but as he being single, had never assumed the marriage vows on himself, it is not easy to see how her violation of them, can be adultery in him, according to the Ecclesiastical law. Moreover if a husband sues for divorce on account of the infidelity of his wife, she may retort the charge upon him; and if they are both found guilty, the Ecclesiastical law does not grant a divorce to either of them. Now suppose a Court of common law were to decide, that if A. commits adultery with the wife of B. and in retaliation, B. commits adultery with the wife of A. that the act of one shall neutralize the act of the,other, and form a kind of legal set off, so that neither of them shall maintain an action for adultery ; such a decision would astonish the world. It is needless however to compare the two codes together, _'n order to shew which *387 has the greatest consistency of principle, for the common law has been solemnly adopted for our guide, by the constitution of Yew-Jersey; and all I need shew, is that according to the fixed principles of this constitutional law, adultery can be committed only with a married woman. It does not punish the sin of adultery, or fornication, either by penances or excommunication ; it leaves that to the upbraidings of a guilty conscience, or to be dealt with by religious judicatories; but considers them as signal and gross violence done to personal rights, and gives redress by a civil action, in which the parties injured are entitled to exemplary damages. In cases of fornication, it gives such action to the parent or master, of the daughter, or servant, that is seduced, and for adultery an action to the husband, and to him alone. There never was an action for adultery known to be maintained at the common law by any but a husband ; shewing that the offence cannot possibly be committed with any other than a married, woman. The heinousness of it consists in exposing an innocent husband to maintain another man’s children, and having them succeed to his inheritance. This is the common law doctrine of adultery transmitted to us from the earliest times, by those venerable sages, wno gathered it from existing precedents, records and decisions, at the times they respectively wrote. I shall cite only a few of them, because the records and decisions referred to by them, have been so faithfully consulted, and the testimony of those sages examined and condensed with such admirable precision, in the imperishable Commentaries of Blaekstone, that it is almost vanity to look behind his work. More definite language cannot be selected for confining adultery to illicit intercourse with a married, woman, than his following definition of the offence. “Adultery, or criminal conversation with a man’s wife.” The woman must not be single; she must be another man’s wife; and whoever, married or single, has llicit intercourse with her, becomes guilty of adultery. The text is in 3 III. Com. 139, and is so clear of ambiguity as to diallengo any attempts to evade it. Let us next see how Butter in Book 1, oh. 6 of his introduction, coincides with the Commentaries ; he says. “ The action of adultery lies for the injury done to the husband, in alienating his wife’s affections, destroying the comfort he had from her company, and raising children, *388 for him to support and provide for.” Bul. N. P. 26. He represents adultery to be an injury to a husband, exposing him to have children of another man, raised, for him to support, while he lives, and to provide for, at his death. This injury to a husband is made the very gist of adultery. No one will suppose him to mean that the alienation of the wife’s affections, and loss of comfort in her company, constitute the offence; the alienation of her affections might accrue from the malignancy of his own temper, and the loss of comfort in her company, from lunacy; he does not mean that any malignancy of temper, or that lunacy or any other sickness amounts to adultery; they are only aggravations that may or may not attend the offence; therefore the essence of adultery at the common law without which the action cannot be maintained, is that criminal intercourse with a married woman, which exposes her husband to support and provide for another man’s issue. Some ingenious casuists, forgetful of their legal law, pretend if this be a true principle, that an action for adultery could never be maintained, where the man’s wife was past the age of procreation, supposing that there is such an age ; whereas by the common law, the possibility of issue is commensurate with life; the Commentaries declare it thus, “A possibility of issue is always supposed to exist in law, unless extinguished by death, even though the donees be each of them an hundred years old.” 2 Bl. Com. 125. Let us next take up Bacon’s Abridgment, that famous repository of the common law, wherein he draws the distinction between fornication and adultery so clearly as to admit of no equivocation. He says. “Fornication is unlawful, because children are begotten without any care for their education; but adultery goes further, it entails a spurious race on a party for whom he is under no obligation to provide.” Bao. Ab. Marriage and Divorce, 569. This is the circumstance on which adultery depends at the common law; its tendency to adulterate the issue of an innocent husband, and to turn the inheritance away from his own blood, to that of a stranger. If the woman be single, her incontinence produces none of this evil; her issue takes away no man’s inheritance ; it can be heir to nobody, and the burthen of its support, is cast bylaw upon herself and the partner of her guilt. Even if her paramour be a married man, it is not adultery, for *389 the same reason; the bastard cannot succeed to his inheritance; neither does it adulterate the issue of his wife; it can never succeed to her inheritance in case she leaves any to descend. She may adulterate her husband’s issue; the law cannot defend him against her; his only reliance is on her virtue; but he can never adulterate hers. This is the reason why a married woman, if her husband become unfaithful, cannot maintain an action of adultery against him or his paramour, in any of the common law Courts; such infidelity does not adulterate her issue, nor his own; it brings no ones inheritance into jeopardy, nor can it possibly produce a spurious heir to disturb the descent of real estates. If she wishes it to be treated as adultery in her husband, she must sue him by a short petition to the Court of Chancery, which, governed by the Eodesiastical law, allows adultery to consist in the breach of marriage vows; and there she may have a decree of divorce and allowance of alimony. But Courts of common law adhere to the maxim so rigidly, that adultery is criminal conversation with a married woman, so prejudicial to the rights of a husband, that it will appear by the records of their Courts from time immemorial, that none but a husband has ever maintained an action for it. Nay they require the proof of his being such, to be of the most rigid kind; they will not receive for evidence of it, universal reputation, hearsay and cohabitation, as they will in all other cases save bigamy alone, but insist upon direct evidence of the marriage. The action, to be maintained, requires incontestable proof of the woman it was committed with, being a married woman ; if there is a failure on this essential point, the action will be dismissed; for the idea of adultery with a single woman, stands opposed to the whole character and genius of the common law. The nature of a penal statute forbids its words to receive a broader interpretation than the sense necessarily requires; penalties are not to be liberally extended by judicial construction ; the rule is that they are to receive a strict construction, if it is almost an imperious one; and the word adultery having a definite and fixed meaning at the common law which is to be our guide, a broader meaning is not to be sought for it in the civil or Ecclesiastical law, or in any laws whatever, foreign to orr constitution. I will barely add that adultery at the common law, is limited to *390 criminal intercourse with a married woman, both by Swift and Reeve who are among our most eminent American Commentators, and that I am acquainted with no treatise on the common law, English or American, to the contrary. Whether its regulation on this point, was borrowed at some early age, from the Levitical law, which-the early dispersion^f the Jews carried into various parts of Europe, I am not able to say; but certain it is, that this wide distinction between criminal intercourse with a married woman, and a single woman, is emphatically settled in the Levitical law; the former being punished with death, while the latter was only a fine. See Levit. oh. 20, verse 10, and Deut. eh. 22, verse 22 to 28. On the whole, I am clearly of opinion that the offence described in the indictment is not adultery; it amounts only to fornication, for which, the defendant should have been indicted ; and on this ground the indictment must be quashed. The defendant could not be found guilty of fornication on an indictment for adultery, wfithout being misled as to the charge against him intended to be proved. No impurity of description is requisite on the record in either case; it is sufficient to charge that at a certain time and place, the defendant with such a person, adultery or fornication did commit.
Hoenblower, C. J.
Justice Ryerson, whose attendance here, is prevented by sickness, has written an opinion against the motion to quash this indictment.*
I have prepared an opinion, which it is unnecessary to read, according with that of Justice Ford.*
This question has never before been determined in this state, I believe: although the law has ever since the year 1704, provided a punishment for the offence.
In Pennsylvania, is a similar law, on which there has been made a different construction.
It has there been decided, that the criminal connection of a single man with a married woman, is not adultery, in him. An unmarried defendant cannot be convicted of adultery, although the other party should be married. 2 Dall. 124; 1 Yeates 6, S. G.
White, J.
Gave no opinion, having argued the case as Attorney-General.
*391 Dayton, J.
Was not on the bench when this case was argued; and gave no opinion.

Indictment quashed.

 Neither of these opinions has been received by the Reporter.