Ezra EVANS

v.

John L. MURFF, District Director Immigration and Naturalization Service.

Civ. No. 7826.

United States District Court

D. Maryland, Civil Division.

Nov. 29, 1955.

Harold Buchman, Baltimore, Md., for plaintiff.

George Cochran Doub, U. S. Atty., and James H. Langrall, Asst. U. S. Atty., Baltimore, Md. (Abraham Scharf, Acting District Counsel, Immigration and Naturalization Service, New York City, on brief), for defendant.

THOMSEN, Chief Judge.

This proceeding to review a deportation order and the denial by the Attorney General of discretionary relief raises the following questions: whether the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., apply to permit review in this case of the denial of discretionary relief; whether the Attorney General and the Commissioner of Immigration and Naturalization are indispensable parties; whether plaintiff is deportable; and whether there was such abuse or error of law in denying suspension of deportation as to warrant judicial intervention. The last question turns principally upon whether plaintiff has "committed adultery" within the meaning of Section 101(f) of the Immigration and Nationality Act, 8 U.S.C.A. 1101(f), in that, while a single man, he cohabited with a married woman.

Plaintiff, a native of Jamaica and subject of Great Britain, last entered the United States at the port of Baltimore in June or July, 1923, as a stowaway on the S.S. Runa. His status was not discovered until 1953. A warrant of arrest in deportation proceedings was issued and served; a hearing was accorded plaintiff to show cause why he should not be deported; and during the course of the hearing, he applied for suspension of deportation. He testified that he had been twice married; that each of his marriages had been terminated by divorce; and that he had been living in an extra-marital relationship with a married woman. The Special Inquiry Officer found that he was deportable; that the requirements for suspension of deportation had been met, except that good moral character had not been established; and denied the application for suspension of deportation. Plaintiff appealed to the Board of Immigration Appeals, challenging only the finding of lack of good moral character. On September 23, 1954, the Board of Immigration Appeals entered an order dismissing the appeal, and a warrant for plaintiff's deportation was issued. On October 19, 1954, he was directed to appear on November 3, 1954, ready for deportation. This suit was instituted before he was taken into custody.

■ In Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, the Supreme Court held that the Administrative Procedure Act, 5 U.S.C.A. §§ 1001, 1009, authorized a district court to review the propriety of a deportation order, even though the Attorney General and the Commissioner of Immigration and Naturalization were not parties to the case and could not be sued in the district where the suit was brought. This court, therefore, has jurisdiction to determine the validity of the deportation order in this case.

■ There can be little doubt, however, about the validity of that order. As a stowaway, plaintiff was excluded from admission under the Immigration Act of February 5, 1917, sections 3 and 19(a), 8 U.S.C.A. §§ 136 and 155(a).[1] Section 241(a) of the Immigration and Nationality Act (1952), 8 U.S.C.A. § 1251(a), provides that "any alien in the United States * * * shall, upon the order of the Attorney General, be deported who—(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry". Section 241 (d), 8 U.S.C.A. § 1251(d), makes the provisions of Section 241(a) applicable even

---

**I.** Now Immigration and Nationality Act, §§ 212(a), 241(a), 8 U.S.C.A. §§ 1182(a), 1251(a).

though the alien entered the United States prior to June 27, 1952. Acts of Congress governing deportation are not subject to the constitutional prohibition against the passage of *ex post facto* laws, and may be retroactive. United States ex rel. Eichenlaub v. Shaughnessy, 338 U.S. 521, 529, 70 S.Ct. 329, 94 L.Ed. 307; Mahler v. Eby, 264 U.S. 32, 44 S.Ct. 283, 68 L.Ed. 549. The five-year limitation contained in the prior law, 8 U.S.C.A. § 155(a), does not prevent deportation under the present act; statutes of limitations confer no vested rights. Pittsburgh Can Co. v. United States, 3 Cir., 113 F.2d 821; Chase Securities Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628; United States v. Obermeier, 2 Cir., 186 F.2d 243, certiorari denied 340 U.S. 951, 71 S.Ct. 569, 95 L.Ed. 685. Moreover, plaintiff did not raise the issue of deportability before the Board of Immigration Appeals, and it is too late for him to raise it now. Tom We Shung v. Brownell, 93 U.S.App.D.C. 32, 207 F.2d 132.

■ The more difficult questions arise out of the attack on the refusal to grant discretionary relief. In the first place, there is serious doubt whether the Administrative Procedure Act gives the court jurisdiction to review such refusal in this suit, although the court would have such jurisdiction in a habeas corpus proceeding. De Pinho Vaz v. Shaughnessy, 2 Cir., 208 F.2d 70, affirming D.C.S.D. N.Y., 112 F.Supp. 778. Cf. Jimenez v. Barber, 9 Cir., 226 F.2d 449. De Pinho Vaz v. Shaughnessy was distinguished, not overruled, by the Second Circuit in Pedreiro v. Shaughnessy, 213 F.2d 768; the possible distinction was not discussed by the Supreme Court on appeal, 349 U.S. 48, 75 S.Ct. 591. Much of the reasoning of the Supreme Court in Shaughnessy v. Pedreiro would apply as well to a review of the denial of discretionary relief as to a review of the validity of a deportation order, but the great confusion in the decisions makes it difficult to be sure whether the denial of discretionary relief can be reviewed in this case.

■ Even if this court has jurisdiction to review the denial of discretionary relief, it should interfere only if there has been a clear abuse of discretion. Kessler v. Strecker, 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082; United States ex rel. Schlimmgen v. Jordan, 7 Cir., 164 F.2d 633; U. S. ex rel. Adel v. Shaughnessy, 2 Cir., 183 F.2d 371; or a failure to exercise discretion, United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681.

The facts in the instant case are undisputed. The Special Inquiry Officer denied the application for suspension of deportation upon the ground that plaintiff had not established good moral character for the period of his residence in the United States, as required by section 101(f) (2) of the Immigration and Nationality Act, 8 U.S.C.A. § 1101(f) (2). The Appeal to the Board of Immigration Appeals was addressed solely to the finding of lack of good moral character.

The Board stated:

"It is clear that respondent is a single (unmarried) person for purposes of the present consideration. He has testified that he has been living in an extra-marital relationship with a woman at Baltimore, Maryland for approximately the past seven years. He has also testified that the woman is, and has been during the entire period, married to another man. In addition, he has testified that her marriage has never been terminated.

"On the basis of the foregoing testimony, the Special inquiry officer has concluded that section 101(f) (2) of the Immigration and Nationality Act precluded respondent from establishing the good moral character requisite to the grant of suspension of deportation."

It is by no means clear, as contended by plaintiff, that this statement by the Board of Immigration Appeals restricts this court to a consideration of the narrow legal question whether plaintiff "committed adultery" within the mean-

ing of section 101(f) (2). The Special Inquiry Officer found that plaintiff had failed to show that he was a person of good moral character, and that finding was affirmed by the Board. Even if plaintiff has not "committed adultery", this court would not undertake to say that the Special Inquiry Officer abused his discretion in holding that plaintiff failed to show that he was a person of good moral character. Only if the statement of the Board be construed as basing the refusal of discretionary relief solely on section 101(f), do we reach the question of the proper construction of that statute. But as I read the law, even if plaintiff gets that far, he still must fail.

Section 101(f), 8 U.S.C.A. § 1101(f) provides:

"For the purposes of this chapter—

"No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was—

\*      \*      \*      \*      \*      \*

"(2) one who during such period has committed adultery".

The Act contains no definition of adultery, and does not state whether the term shall have a uniform meaning throughout the country, or shall depend upon the law of the state in which the person is living. But Senate Report No. 1137, 82d Congress, 2d Session, p. 6, states:

"Section 101(f), while not defining the term 'good moral character', provides standards as an aid for determining whether a person is one of good moral character within the meaning of those provisions of the bill which require that good moral character be established for certain periods in connection with a person's eligibility for certain benefits. By providing who shall not be regarded as a person of good moral character, it is believed that a greater degree

of uniformity will be obtained in the application of the 'good moral character' tests under the provisions of the bill."

The question came before the Second Circuit in United States ex rel. Zacharias v. Shaughnessy, 221 F.2d 578, 580. The court said:

"We can dispose quickly of Zacharias' contention that his admitted sexual relations with Eugenia while she was still married to another man did not constitute adultery. Under both the law of the state where the acts occurred, see N.Y.Penal Law, McK.Consol.Laws, c. 40, § 100, and the general common-law definition, Zacharias is guilty of adultery, even though he himself was single at the time. Miller, Handbook of Criminal Law, § 136 (1934); 2 C.J.S., Adultery, §§ 1, 2, 3, 4, pages 472–474. There is no reason to suppose that Congress in enacting 8 U.S.C., § 1101(f) (2) intended to adopt the contrary definition of ecclesiastic law which is the rule in only a minority of states."

The statutes of the various states use the word "adultery" in different senses. 2 C.J.S., Adultery, §§ 1–4, pp. 472–474; 1 Am.Jur. 683–684 (Adultery, secs. 2, 4, 7, 8). The Maryland law is not clear. The original statute was Ch. 27, Laws of 1715. It provided:

"That every Person or Persons, that shall commit Adultery, and shall be thereof convict, either by Confession or Verdict of Twelve Men, either in the Provincial, or any of the County Courts of this Province, shall be fined by the Justices before whom such Conviction shall be, Three Pounds current Money, as aforesaid, or Twelve hundred Pounds of Tobacco, \* \* \* And in Case the said Offenders, or any of them, shall not have wherewith to pay the several Fines of this Act imposed, then the said Offenders shall be adjudged to suffer Corporal Punishment, by Whipping upon his or their bare Bodies till the Blood

do appear, so many Stripes, not exceeding Thirty nine, as the Justices, before whom such Conviction shall be, shall adjudge."

The statute has been amended to change the penalty to $10, and so amended now appears as Article 27, § 4 of the Annotated Code of Maryland. It has never been construed by the Court of Appeals. In recent years no unmarried man has been prosecuted under the statute in Baltimore City. But the Act of 1715 was passed at a time when anticlerical feeling was high, Andrews, History of Maryland, p. 224, and it therefore seems probable that the legislature intended the word "adultery" to carry its common law meaning rather than its meaning in ecclesiastical law. State v. Lash, 16 N.J.L. 380, 381. Moreover, the common law meaning is the same as the meaning in Leviticus 20:10 and Deuteronomy 22:-22–29, which must have influenced the framers of the 1715 Act.

At common law the test was whether the woman was married. "Adultery is criminal conversation with a man's wife." 3 Blackstone's Commentaries, 140. See also Bacon's Abridgement, title "Marriage", 569. The essence of adultery at common law, and under the statute passed during the Commonwealth in England, was criminal intercourse with a married woman, which tended to adulterate the issue of an innocent husband, to turn the inheritance away from his own blood to that of a stranger, and to expose him to support and provide for another man's issue. 1 Am.Jur. 683 (Adultery sec. 3).

The term "adultery" in divorce law in this country includes the act of a married man who has intercourse with a single woman, as well as intercourse by or with a married woman, 17 Am. Jur. 169 (Divorce & Sep. sec. 35), and the popular meaning of the word has come to be "sexual unfaithfulness of a married person", Webster's New International Dictionary. It is not necessary in this case, however, to determine whether the phrase "who has committed adultery", as used in section 101(f), applies to a married man who has intercourse with an unmarried woman. Cf. Petition of Smith, D.C.N.J., 71 F. Supp. 968. It is only necessary to determine whether Congress intended the phrase to have the same meaning throughout the country, and, if so, whether it would comprehend the case of a single man who has intercourse with a married woman. I conclude that both questions should be answered in the affirmative. United States ex rel. Zacharias v. Shaughnessy, supra.

The Board of Immigration Appeals did not misinterpret the law, and neither the Special Inquiry Officer nor the Board was guilty of any abuse of discretion.

The complaint must be dismissed, and it is so ordered.