MATTER OF PITZOFF

In DEPORTATION Proceedings

A-12470682

*Decided by Board August 13, 1962*

(1) Respondent, a single female, who engaged in a meretricious husband-wife relationship with a married man in the State of Oregon, is not deemed to have committed adultery under the law of that State.

(2) Notwithstanding respondent is not precluded from establishing good moral character by the provisions of section 101(f)(2) of the Immigration and Nationality Act and is not statutorily ineligible for the discretionary relief of voluntary departure, her illicit sexual relations with a married man, maintained with full knowledge of her paramour's marital status, justify denial of such relief as a matter of administrative discretion.

CHARGE: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Remained longer—visitor.

This is an appeal from the order of the special inquiry officer finding respondent deportable upon the ground stated above and denying her application for voluntary departure. The appeal will be dismissed.

Respondent, a 19-year-old single female, a native of Bulgaria and citizen of Germany, last a resident of Canada, was admitted to the United States on January 24, 1962, as a visitor for a period ending on January 31, 1962. She failed to obtain an extension of her stay and has remained in the United States without authority. She is clearly deportable as charged.

Respondent requested voluntary departure. The special inquiry officer found her ineligible as a matter of law and also stated that had she been eligible for the relief, he would have denied it as a matter of discretion because she lacked good moral character. The finding of statutory ineligibility for voluntary departure is based upon the fact that the respondent lived in a husband and wife relationship with a married man while in the United States.

The record reveals that the respondent's paramour left his wife in New York and came to Canada where he met respondent and began

the relationship with her apparently in late 1961. He came to the United States about January 1962, the respondent joined him shortly thereafter and they commenced living together. The man testified that he had been separated from his wife for about a year, that neither he nor his wife saw any possibility of reconciliation, and that both desired a divorce. The respondent and her partner stated they intended to marry.

Section 244(e) of the Act (8 U.S.C. 1254(e)) under which the respondent applied for voluntary departure requires the applicant to establish good moral character for five years. Section 101(f)(2) of the Act (8 U.S.C. 1101(f)(2)) provides that no person shall be found to be a person of good moral character who during the period for which good moral character must be established "has committed adultery."

In finding that respondent had committed adultery and was, therefore, statutorily ineligible for the relief requested, the special inquiry officer relied upon the fact that in the State of Oregon a single female who has illicit sexual intercourse with a married man may be prosecuted for adultery (*State* v. *Case*, 61 Oreg. 265). Counsel is of the belief that it is improper to apply a state standard since a federal law is involved. He contends that in the absence of a federal statutory definition, the common law definition should obtain, and points to the fact that under the common law adultery could be committed only where the woman was married. Admitting that there is no case directly on the point, he relies upon *Evans* v. *Murff*, 135 F. Supp. 907 (D.C. Md. 1955); *Dickhoff* v. *Shaughnessy*, 142 F. Supp. 535 (S.D. N.Y. 1956); and *United States* v. *Shaughnessy*, 221 F. 2d 578 (2d Cir. 1955).

Under the common law, both parties committed adultery, if a married woman engaged in sexual relations with a man other than her husband whether the man was married or single. Under ecclesiastical law, adultery existed as to the married person, whether male or female, who engaged in sexual relations with one other than the lawful spouse. It mattered not that the unlawful partner was married or single; however, if the unlawful partner was single, the single person's crime was not adultery, but fornication. In most jurisdictions in the United States, the common law definition has been enlarged by statute to provide that adultery is committed by a married person who has sexual intercourse with some person other than the lawful spouse. It is in this last sense that adultery is popularly defined. An unmarried partner in the illicit affair is in some states guilty of adultery while in other states the single person cannot be convicted of adultery (2 C.J.S. Adultery secs. 1 and 11).

We find no clear-cut judicial holding that a federal standard based upon the common law definition of adultery should apply in constru-

ing section 101(f)(2) of the Act. *U.S. ex rel. Zacharias* v. *Shaughnessy*, 221 F. 2d 578 (2d Cir. 1955) (single man—married woman) holds that the provisions of the Act concerning good moral character did not apply to *Zacharias* because of the existence of a savings clause. The courts' comments concerning adultery are dicta. Furthermore, it is to be noted that the court held adultery existed under either the common law or the law of New York where the acts of adultery were committed. *Dickhoff* v. *Shaughnessy*, 142 F. Supp. 535, S.D.N.Y. (1956) (married man—single woman) concerned a commission of adultery that was artificial in that it was the result of a divorced man remarrying without knowledge that his divorce was invalid. No federal definition of adultery was attempted, the court holding that adultery, if adultery had been committed, could be found only by reason of the New York statutes. The court pointed out that if the common law were relied upon, there would have been no adultery (142 F. Supp. at 539). (The court also stated that Congress desired to rely upon the past judicial interpretations as to good moral character (142 F. Supp. at 539.) *Evans* v. *Murff*, 135 F. Supp. 907 (D. Md. 1955) (single man—married woman) holds that Congress intended that the definition of adultery be the same throughout the country and that Congress probably intended to apply the common law to the definition of adultery rather than the ecclesiastical. However, it is noted that the court found that in the case before it that adultery had probably been committed under the laws of Maryland. Moreover, by reserving the question as to whether adultery is committed by a married man who has sexual intercourse with an unmarried woman, the court indicated that the common law definition may not control (135 F. Supp. at 911).

The history of the legislation reveals no indication that Congress desired that the common law standard be imposed or that there be a departure from the administrative and judicial reliance upon state law in determining whether adultery existed. The committee of Congress upon whose recommendation the Act was based recommended that "more uniform regulations should be employed * * * to the end that a higher general standard of goods (*sic*) morals and personal and political conduct are (*sic*) established" and comment was made concerning the "confusion" which existed because all aliens who had committed adultery were not treated alike by both courts and administrative officials (S. Rept. No. 1515, 81st Cong. 2d Sess. 699–701 (1950), see, S. Rept. No. 1137, 82nd Cong. 2d Sess. 6 (1952)). It is our belief that Congress' desire that there be uniformity related not to the method to be used in determining whether adultery had been committed, but related rather to the desire that *all* persons who had committed adultery should be barred from the prizes of the law. This

37

provision is in consonance with the finding of the court in *Dickhoff* that Congress wished to rely upon past judicial interpretations as to good moral character and it takes cognizance of the fact that Congress has not criticized the long established administrative practice (based upon the judicial rulings) in which a determination as to whether there had been the commission of adultery was made dependent upon the law of the state in which the act occurred.

It appears to us, therefore, that to determine the issue before us, we must decide whether respondent has committed adultery under the civil or criminal laws of Oregon. *State* v. *Case*, 61 Oreg. 265, 122 P. 304 (1912), relied upon by the special inquiry officer concerned a married man who had been indicted for committing adultery with a single woman. She also had been indicted for adultery. The case appears to hold that although the single woman could not commit adultery, she could be convicted of adultery because she was an accomplice of the person who had violated the laws of the state concerning the commission of adultery. Since the woman was an accomplice, she could be indicted as a principal and convicted of adultery. For an analogy, the court gave the example of a person who because he had aided a man and woman to commit bigamy, could under the laws of Oregon be himself convicted for bigamy. As far as the law of Oregon is concerned, it is only technically and artificially that adultery has occurred in relation to the single woman. We do not believe that *Case* is authority for holding that within the framework of the immigration laws, a single female who has engaged in sexual relations with a married man in Oregon has *committed* adultery. The respondent is, therefore, in our opinion not statutorily ineligible for the relief requested.

Counsel contends that if the respondent is not statutorily ineligible for relief, she should be found to be of good moral character although she lived with a married man. Counsel is of the belief that consideration must be given to the fact that the respondent had been brought up in Europe where a different standard allegedly relates to such matters and he also asks that consideration be given to the fact that the parties intended getting married. Counsel requests that he be permitted to produce expert witnesses who would testify as to the general moral attitude of the community concerning respondent's conduct. The examining officer in a brief opposes these contentions.

Whether a person is of good moral character or not, is to be judged by standards prevailing in the United States. The declaration of Congress concerning the denial of relief to a person who has committed adultery represents the moral feeling prevalent generally in the United States (*Petitions of F–G and E–E–G–*, 137 F. Supp. 782 (S.D.N.Y., 1956)). It is an indication of the attitude to be taken to illicit rela-

tions by a single woman with a married man. We agree with the special inquiry officer, that the meretricious relationship maintained by the respondent, with the full knowledge that her paramour was a married man, that he had not been divorced, and that he could not get a final divorce because he could not satisfy residential requirements (p. 22) justifies a denial of relief as a discretionary matter.

Prior to the service upon counsel on April 24, 1962 of the special inquiry officer's order, he had inquired of the District Director at Portland, Oregon concerning inclusion into the record of a copy of a divorce decree obtained in Mexico on April 11, 1962 by the respondent's paramour from his wife. The legal papers submitted with the divorce were entitled "Motion to Reopen" and were served upon the District Director who acknowledged receipt in writing on April 24, 1962. (Whether the motion was filed before or after service upon counsel on the same day of the special inquiry officer's order is not clear, but the matter is immaterial.) There is no indication that the fee for the filing of the motion to reopen was paid (8 CFR 103.5). On April 30, the District Director apparently returned the motion papers to counsel. On May 1, counsel wrote a letter to the special inquiry officer attaching the motion and divorce decree and explaining that the purpose of his action was to have the record completed for the benefit of the Board in consideration of the appeal to the Board he had filed on May 1, 1962. On May 2, 1962, the special inquiry officer wrote to counsel stating that the only way the divorce decree could be made a part of the record was by motion to reopen and since such a motion had not been properly submitted, the divorce decree was being attached to the record for the information of the Board in considering the appeal which counsel had filed.

Counsel complains that his motion was not properly forwarded to the special inquiry officer. Counsel's contentions are not justified. After the hearing had been closed and before an appeal to the Board had been filed counsel could make the divorce decree a part of the record only by obtaining a reopening of proceedings from the special inquiry officer. The motion to reopen was not filed with a fee and was therefore, properly returned to counsel (8 CFR 103.5). Of course in connection with an appeal, and without the payment of a fee in addition to that paid for filing the appeal, the Board can be requested to reopen proceedings to receive new evidence. In the instant case a request for such action would not have been granted since no purpose would be served in making the divorce decree a part of the record; the divorce decree does not excuse the conduct which occurred before the decree was obtained (see *Matter of C—*, 6 I. & N. Dec. 675).

**ORDER:** It is ordered that the appeal be and the same is hereby dismissed.