## KESSLER, DISTRICT DIRECTOR OF IMMIGRATION AND NATURALIZATION, *v.* STRECKER.

No. 330. Argued February 10, 13, 1939.—Decided April 17, 1939.

*Solicitor General Jackson,* with whom *Assistant At-
torney General McMahon,* and *Messrs. William W.
Barron, Matthew F. McGuire, Benjamin M. Parker,* and
*W. Marvin Smith* were on the brief, for petitioner.

*Messrs. Whitney North Seymour* and *C. Alpheus
Stanfield,* with whom *Messrs. Herbert T. Wechsler* and
*Carol King* were on the brief, for respondent.

By leave of Court, briefs of *amici curiae* were filed by
*Mr. Martin Dies,* urging reversal; and by *Mr. Joseph R.
Brodsky* on behalf of the Communist Party of the United
States, urging affirmance.

MR. JUSTICE ROBERTS delivered the opinion of the
Court.

The respondent is an alien who entered the United
States in 1912 and has since resided here. In 1933 he
applied for naturalization to a United States District
Court in Arkansas. He made certain admissions to a
District Director of Naturalization as a result of which

naturalization was withheld and his case was referred to the Department of Labor.

November 25, 1933, the Second Assistant Secretary of Labor issued a warrant for the respondent's apprehension, in which it was recited that he was in the United States in violation of law in that (1) he believes in, advises, advocates or teaches the overthrow, by force or violence, of the Government of the United States; (2) he is a member of, or affiliated with, an organization, association, society, or group that believes in, advises, advocates or teaches the overthrow, by force or violence, of the Government of the United States; (3) he is a member of, or affiliated with, an organization, association, society, or group that writes, circulates, distributes, prints, publishes or displays, or causes to be written, circulated, distributed, printed, published or displayed, or that has in its possession for these purposes written or printed matter advising, advocating or teaching the overthrow, by force or violence, of the Government of the United States; and (4) after his entry into the United States he has been found to *have become* a member of one of the classes of aliens enumerated in § 1 of the Act of October 16, 1918, as amended by the Act of June 5, 1920, to wit: an alien who is a member of, or affiliated with, an organization, association, society or group that believes in, advises or teaches the overthrow, by force and violence, of the Government of the United States.

The respondent was apprehended and was given hearings before an Immigration Inspector, at which he was represented by counsel and testified in his own behalf. The Government offered in evidence transcripts of his examination by the Naturalization Bureau, of an interview with him by an Immigration Inspector, and his membership book in the Communist Party of the U. S. A., issued November 15, 1932, with stamps affixed showing payment of dues to the end of February, 1933. The rules

of the party, set forth in the book, provided that failure to pay dues for three months automatically results in the loss of membership, and it is admitted there is no evidence respondent continued to be a member after March 1, 1933.

The book contained printed matter stating the purposes and objects of the party. The Government also offered a copy of a magazine called "The Communist," dated April 1934, and read into the record excerpts from 'articles appearing therein. The respondent admitted that he joined the Communist Party in November 1932, asserted that his membership terminated prior to March 1, 1933, and had never been renewed, and professed ignorance of the magazine called "The Communist" and its contents. In some respects his testimony as to his beliefs and actions was contradictory of his statements on prior examinations, and testimony was elicited from him in an effort to show that his denial of present affiliation with the Communist Party might not be made in good faith; but there was no sufficient evidence to sustain that conclusion. After a review of the record by the Board of Review of the Department of Labor, a warrant of deportation was issued by the Assistant Secretary which recites an affirmative finding as to each of the counts in the warrant of arrest and orders the respondent's deportation.[1]

The respondent petitioned a federal district court in Arkansas for a writ of *habeas corpus* to deliver him from the custody of the Immigration Inspector. The writ was denied. Thereafter he filed the petition in the instant case in the District Court for Louisiana. In this peti-

---

[1] The delay in this case is due to the fact that respondent was born an Austrian subject but was refused reëntry into that country on the ground that the place of his birth is now in Poland. Protracted negotiations on the part of the Department were required to obtain the consent of the government of Poland to his return to that country.

tion he alleged that he had not been accorded a fair hearing; that the Department of Labor had not correctly construed the immigration laws applicable to his case; that the findings were without support in the evidence; that he had been denied due process of law, and that he is not a citizen of Poland, to which the warrant directed his remission. The District Court dismissed the writ. The respondent appealed to the Circuit Court of Appeals assigning error to the District Court's action in denying each of his contentions. That court found that the hearings had been fair, but held that each of the findings recited in the warrant was without support in the evidence. The court was of opinion the evidence failed to show that the respondent is now a member of the Communist Party or that he or that party, in 1933, taught, advocated, or incited the overthrow of the Government by force and violence, and that the record was bare of evidence to countervail his denial that he had ever taught or believed in the unlawful destruction or overthrow of the Government by force. The court held that the Acts of 1918 and 1920 were passed to meet a situation caused by crises in Russia in 1918 and 1919; [2] that the major changes in policy and conduct of the Soviet Socialist Republics which had taken place between 1918 and 1933 rebutted the implications arising from membership in the Communist Party at the time the Acts were adopted; that mere membership in that party in 1933 is not a statutory ground for deportation. The order of the District Court was reversed and the cause was remanded for further proceedings not inconsistent with the opinion. [3]

The Government moved for a rehearing, pressing specially the contention that the overwhelming weight of

[2] That this view is erroneous is shown by the history of the legislation referred to *infra*, p. 30. Compare, House Report 504, 66th Cong., 2nd Sess., p. 7; Senate Report 648, 66th Cong., 2nd Sess., p. 4.

[3] 95 F. 2d 976.

authority is to the effect that membership in the Communist Party is sufficient to warrant deportation. The petition was entertained, the judgment was amended to provide: "Reversed, with directions to try the issues *de novo* as suggested in Ex Parte Fierstein, 41 Fed. (2d) p. 54"; and a rehearing was denied.[4] Judge Sibley dissented on the ground that on the basis of the respondent's membership book which refers to the Third Communist Internationale, the court could take judicial notice of the objectives and programs of the Communist Party and the Third Internationale.

The United States petitioned for certiorari, asserting that the single question presented is "whether the court below erred in failing to sustain an order of deportation against respondent, an alien who in 1932 became a member of the Communist Party of the United States." In its specification of errors to be urged the Government enumerated (1) the holding that an alien who became a member of the party in 1932 is not, by reason of that fact, subject to deportation; (2) the holding that the evidence before the Secretary of Labor concerning the principles of the party was insufficient to sustain the order; (3) the remand for a trial *de novo* in the District Court, and (4) the failure to affirm the judgment of the District Court. As reason for the granting of the writ the Government urged a conflict of decision on the question whether membership by an alien in the Communist Party of America subjects him to deportation. By reason of the allegation of conflict and the action of the Circuit Court of Appeals in ordering a trial *de novo* in the District Court, we granted the writ.

The Government does not attempt to support the warrant of deportation on the second and third grounds therein specified, namely, that the respondent "is a mem-

[4] 96 F. 2d 1020.

ber of or affiliated with" an organization described in the Act. The only evidence of record is that his membership ceased months before the issue of the warrant for his arrest. The contention is that respondent is deportable because, after entry, he became a member of a class of aliens described in § 1 of the Act, to wit, a member of the Communist Party, an organization membership in which is made a cause of deportation because the organization believes in, advocates, and teaches the overthrow of the Government of the United States by force and violence. This contention presents the question whether the Act renders former membership in such an organization, which has ceased, a ground of deportation. Respondent insists that the statute makes only present membership in an organization described in the Act such ground.

Section 1 of the Act of October 16, 1918, as amended in 1920,[5] has to do with the exclusion of alien immigrants and specifies five classes, members of which may not be admitted to the United States. One of these classes— subsection (c)—includes "aliens who believe in, advise, advocate, or teach, or who *are* members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches . . . the overthrow by force or violence of the Government of the United States. . . ."

Section 2 of the Act of 1918,[6] which was not altered by the Act of 1920, deals with deportation. It provides that "any alien who, *at any time* after entering the United States, is found to have been at the time of entry, or *to have become thereafter,* a member of any of the classes of aliens enumerated" in § 1, shall, upon war-

[5] Act of Oct. 16, 1918, c. 186, 40 Stat. 1012, as amended by the Act of June 5, 1920, c. 251, 41 Stat. 1008; U. S. C. Tit. 8, § 137 (a) to (e).

[6] 40 Stat. 1012; U. S. C. Tit. 8, § 137 (g).

rant of the Secretary of Labor, be taken into custody and deported, in the manner provided by law.

Relying on the phrases italicized in the quotation, the Government insists that the section embraces an alien who, after entry, has become a member of an organization, membership in which, at the time of his entry, would have warranted his exclusion, although he has ceased to be a member at the time of his arrest. We hold that the Act does not provide for the deportation of such an alien. This conclusion rests not alone upon the language, but, as well, upon the context and the history of the legislation.

The phrase "at any time" qualifies the verb "found." Thus, if at any time the Secretary finds that at entry the alien was a member, or has thereafter become and is a member, he may be deported. The natural meaning is that, as the alien was excludable for present membership, he is deportable for present membership subsequently acquired. The Government's construction, which collocates the phrase "at any time" with the phrase "or to have become thereafter" is unnatural and strained. If Congress meant that past membership, of no matter how short duration or how far in the past, was to be a cause of present deportation the purpose could have been clearly stated. The section does not bear this import.

By the first section of the Act, as amended in 1920, aliens are to be excluded who *are* members of a described organization. The section does not require the exclusion of those who have been in the past, but are no longer, members. When the Congress came to provide for deportation, instead of again enumerating and defining the various classes of aliens who might be deported, it provided that if at any time it should be found that an alien had been admitted and, at the time of admission, was a member of any of the proscribed classes, or had thereafter become such, he should be deported. It is not to be

supposed that past membership, which does not bar admission, was intended to be a cause of deportation. And the fact that naturalization is denied to an alien only on the ground that he "*is* a member of or affiliated with any organization entertaining" disbelief in or opposition to organized government, and not for past membership or affiliation,[7] lends added force to this view.

In the absence of a clear and definite expression, we are not at liberty to conclude that Congress intended that any alien, no matter how long a resident of this country, or however well disposed toward our Government, must be deported, if at any time in the past, no matter when, or under what circumstances, or for what time, he was a member of the described organization. In the absence of such expression we conclude that it is the *present membership*, or *present affiliation*—a fact to be determined on evidence—which bars admission, bars naturalization, and requires deportation. Since the statute deals not only with membership in an organization of the described class, but with affiliation therewith and, as well, with belief and teaching, it enables the Secretary of Labor, as trier of the facts, fully to investigate and to find the true relation, belief and activity of the alien under investigation.

The legislative history of the statute supports this conclusion. By Act of March 3, 1903,[8] Congress directed the exclusion of "anarchists, or persons who believe in or advocate the overthrow by force or violence of the Government of the United States, . . ."[9] and also of any "person who disbelieves in or who is opposed to all organized government, or who is a member of or affiliated with any organization entertaining and teaching such disbe-

---

[7] Act of June 29, 1906, c. 3592, § 7, 34 Stat. 596, 598.

[8] 32 Stat. 1213.

[9] § 2, 32 Stat. 1214.

lief in or opposition to all organized government . . . "[10] The only section authorizing deportation of such persons is directed to an alien found to have entered in violation of the Act, if proceeded against within three years after entry.[11] These provisions were reënacted without alteration in the Act of February 20, 1907.[12]

The first legislation authorizing deportation of persons who had entered lawfully is H. R. 6060, enacted by the 63rd Congress but vetoed by President Wilson January 28, 1915.[13] This bill required deportation of "any alien who *within five years after entry* shall be found advocating or teaching" the defined doctrines. It also altered existing law in respect of deportation of those who had entered illegally to provide that *"at any time within five years after entry,* any alien who *at the time of entry* was a member of one or more of the classes excluded by law"* should be deported.

A bill, in substance the same, was introduced in the 64th Congress and enacted February 5, 1917, over Presidential veto.[14] While this measure was in course of passage, the Chairman of the House Committee in charge of it moved, on behalf of the Committee, to amend § 19 by inserting the phrase "at any time" so that the section should provide for deportation of "any alien who *at any time after entry* shall be found advocating or teaching" forcible overthrow of the government. The Act, as adopted, was in this form. The purpose of the amendment was to make plain that no time limit was fixed for deportation of aliens found advocating the doctrine.[15]

---

[10] § 38, 32 Stat. 1221.

[11] § 21, 32 Stat. 1218.

[12] 34 Stat. 898, §§ 21 and 38, pp. 905, 908.

[13] House Document No. 1527, 63rd Cong., 3rd Sess.

[14] 39 Stat. 874.

[15] See 53 Cong. Rec. Part. 5, p. 5165, 64th Cong., 1st Sess.; Sen. Rep. 352, p. 14, 64th Cong., 1st Sess. to accompany H. R. 10384.

32

The Act of 1917 was amended by that of October 16, 1918, here under consideration, which, by its title, purported to apply to "aliens who *are* members of the anarchistic and similar classes. . . ."

Section 1 enlarged one of the classes of excludable aliens by the addition of the words "aliens who *are* members of or affiliated with any organization that entertains a belief in, teaches or advocates the overthrow by force or violence of the Government of the United States. . . ." Section 2 modified the earlier Act in respect of deportation, both in form and substance. The provision for deportation of those who, at the time of entry, were members of one of the proscribed classes was retained, but the five year period of limitation within which deportation might be had was eliminated.[16] The provision for deportation of aliens of anarchistic and similar classes was expanded by including as causes of *deportation* all the causes *of exclusion* enumerated in § 1 which were themselves much broader than those included in the 1917 Act. Thus, although there was no provision in the Act of 1917 for deportation of aliens who did not personally advocate the proscribed doctrine, but were members of an organization which did, the Act of 1918 embodied such a provision. This alteration, and the elimination of the five year time limitation, were the important changes, relevant to the question under examination, which the Act of 1918 effected in the earlier legislation. These modifications lend no support to the contention that § 2 of the Act of 1918 was intended to make quondam membership a ground of deportation.

Nor is there anything in the formal alteration worked by the Act of 1918 which leads to a different conclusion. Section 19 of the Act of 1917 dealt in distinct clauses with the various classes of aliens who might be deported, speci-

---

[16] House Rep. 645, 65th Cong., 2nd Sess.

fying in one clause an alien "who at the time of entry was a member of the classes excluded by law" and, in another clause, an alien "who, at any time after entry, shall be found advocating or teaching" the obnoxious doctrines. Section 2 of the Act of 1918 combined the clauses dealing with the two groups in a single sentence, with a somewhat different locution. We think this consolidation was not intended to alter the substantive law as it theretofore stood.

The only decisions which support the Government's position are those in the Second Circuit.[17] We cannot approve their reasoning or result. It is claimed that the administrative construction has always accorded with the Government's contention in the present case. We cannot find that there has been such a uniform construction as requires an interpretation of the Act in accordance with that view. The administrative construction seems to have been in favor of the respondent's view until after the decision in the *Yokinen* case,[18] and the construction seems to have been changed in deference to the decision in that case.[19]

Our reading of the statute makes it unnecessary to pass upon the conflicting contentions of the parties concerning the adequacy of the evidence before the Secretary concerning the purposes and aims of the Communist Party or the propriety of the court's taking judicial notice thereof.

---

[17] *United States ex rel. Yokinen* v. *Commissioner of Immigration,* 57 F. 2d 707; *United States ex rel. Mannisto* v. *Reimer,* 77 F. 2d 1021.

[18] House Rep. 504, p. 9, 66th Cong., 2nd Sess. Hearings Communist and Anarchistic Deportation Cases, H. R. 66th Cong., 2nd Sess. Subcommittee of Committee on Immigration and Naturalization, April 21, 24, 1920, p. 17.

[19] See letter of Secretary of Labor embodied in Senate Rep. 769, 75th Cong., 1st Sess.

The Solicitor General suggests that the evidence is sufficient to sustain the warrant of deportation on the first ground therein stated, namely, that the respondent believes in and teaches the overthrow, by force and violence, of the Government of the United States. It is said that the error of the Circuit Court of Appeals in reversing the District Court is, in this aspect, so plain that we should notice it, although the petition does not present the question. We have the power to do this in the case of plain error,[20] but we exercise it only in clear cases and in exceptional circumstances.

We do not know on what grounds the District Judge's action rested since he wrote no opinion. The Circuit Court of Appeals held the evidence insufficient to support the Secretary's finding. We think that the record does not justify a reversal of the holding of the court below upon this point.

The Circuit Court of Appeals remanded the cause to the District Court for a trial *de novo*. In this we think there was error. The proceeding for deportation is administrative.[21] If the hearing was fair, if there was evidence to support the finding of the Secretary, and if no error of law was committed, the ruling of the Department must stand and cannot be corrected in judicial proceedings.[22] If, on the other hand, one of the elements mentioned is lacking, the proceeding is void and must be set aside.[23] A district court cannot upon *habeas corpus,* proceed *de novo,* for the function of investigation and finding has not been conferred upon it but upon the Secretary of Labor. Only in the event an alleged alien asserts his United States

[20] *Mahler* v. *Eby,* 264 U. S. 32, 45.

[21] *Pearson* v. *Williams,* 202 U. S. 281; *Zakonaite* v. *Wolf,* 226 U. S. 272.

[22] *Zakonaite* v. *Wolf, supra; Tisi* v. *Tod,* 264 U. S. 131, 133.

[23] *Vajtauer* v. *Commissioner,* 273 U. S. 103, 106; *Gegiow* v. *Uhl,* 239 U. S. 3.

citizenship in the hearing before the Department, and supports his claim by substantial evidence, is he entitled to a trial *de novo* of that issue in the district court.[24] The status of the relator must be judicially determined, because jurisdiction in the executive to order deportation exists only if the person arrested is an alien; and no statutory proceeding is provided in which he can raise the question whether the executive action is in excess of the jurisdiction conferred upon the Secretary.[25]

It follows from what has been said that, as the Secretary erred in the construction of the statute, the writ must be granted and the respondent discharged from custody.

The judgment of the Circuit Court of Appeals is accordingly modified and the cause is remanded to the District Court with instructions to proceed in conformity with this opinion.

*Affirmed with modification.*

Mr. Justice McReynolds, dissenting:

Mr. Justice Butler and I cannot acquiesce in the disposition of this cause or in the supporting opinion just announced. It seems worthwhile briefly to indicate our views.

More than five years have passed since the alien respondent was arrested and ordered to show why he should not be deported. The record of the following proceedings before the Labor Department and in the courts, printed on eighty-four pages, is before us. It is not very difficult to understand. Without question we have power finally to dispose of the cause upon the merits notwithstanding

---

[24] *United States* v. *Sing Tuck,* 194 U. S. 161, 167; *Bilokumsky* v. *Tod,* 263 U. S. 149, 152, 153.

[25] *Ng Fung Ho* v. *White,* 259 U. S. 276; compare *Tod* v. *Waldman,* 266 U. S. 113, 119.

any omissions or defects found in the petition for certiorari. In the circumstances, we think that course should be taken. The District Court upon another view of the record can ascertain nothing not open to us.

If this alien is guiltless of the charge against him he should be liberated without more ado; if guilty, the public should be relieved of his presence now. That he is an undesirable is made manifest.

The construction of the statute adopted by the Court seems both unwarranted and unfortunate. If by the simple process of resigning or getting expelled from a proscribed organization an alien may thereby instantly purge himself after months or years of mischievous activities, hoped-for protection against such conduct will disappear. Escape from the consequences of deliberate violations of our hospitality should not become quite so facile.[1]

Seven years ago, the Court of Appeals, Second Circuit, construed the statute under consideration in *United States ex rel. Yokinen* v. *Commissioner of Immigration*, 57 F. 2d 707–708. There the alien had been expelled from the Communist Party before his arrest, and for that reason he unsuccessfully claimed exemption. The following excerpts from the court's opinion, with force and directness, express our view concerning the true meaning of the enactment—

"It is true that he was not a member of the Communist Party when arrested. He had recently been expelled because of his attitude toward negroes, but that did not remove him from the reach of the statute. We have nothing to do with shaping the policy of the law

---

[1] Strecker, born in Poland in 1888, was admitted to the United States in 1912.

He joined the Communist Party November, 1932, but paid no dues subsequent to February, 1933. He claims that under the Party rules failure to pay for four weeks causes membership to cease. Warrant for his arrest issued in November, 1933.

towards aliens who come here and join a proscribed society. Congress has provided that 'any alien who, at any time after entering the United States, is found to have been at the time of entry, or to have become thereafter, a member of any one of the classes of aliens enumerated in this section' shall be deported. 8 USCA § 137 (g). This alien concededly did become after entry a member of 'one of the classes * * * enumerated' and from that time became deportable. We are urged to ameliorate the supposed harshness of the statute by reading into it words that Congress saw fit to leave out and interpret it to apply not to aliens who become members, but only to those who become and continue to the time of their arrest to be members, of one of the enumerated classes. If the words used in the statute were equivocal or the intention of Congress for any reason uncertain, there might be room for such a construction as that for which the appellant now contends. Perhaps the sufficient answer is that had Congress intended membership at the time of arrest to be the criterion it would have said so. It has the power to determine what acts of an alien shall terminate his right to remain here. *Skeffington* v. *Katzeff et al.* (C. C. A.) 277 F. 129. What it did do was to make the act of becoming a member a deportable offense without regard to continuance of membership and it did that in language so plain that any attempt to read in any other meaning is no less than an attempt to circumvent the law itself.

"Since the appellant admittedly had, after entry, become a member of a proscribed organization, the undisputed evidence required the order from which this appeal was taken. All proof upon which he was held to be affiliated with the Communist Party was unnecessary, and while we do not mean to intimate that any evidence on that phase of the case was unfairly received and considered, in any event it did him no harm."

A petition for certiorari asking this Court to review the judgment of the Circuit Court of Appeals was refused October 10, 1932 (287 U. S. 607). It stressed the point that—"A fair and proper construction of the statute requires that it be confined in its operation to aliens who are members of or affiliated with a proscribed organization at the issuance of the warrant of arrest."

The unusual importance of the question was not difficult to appreciate.

In the presence of clear and positive expression of Congressional intent to the contrary we do not feel at liberty to conclude that an alien who after entry has shown his contempt for our laws by deliberately associating himself with a proscribed organization must be allowed to remain if he resigned or was debarred a day, a month or a year before his arrest. An experienced court years ago declared that would be "no less than an attempt to circumvent the law itself."