Epstratios KARAYANNIS, Appellant,

v.

Herbert BROWNELL, Jr., Attorney General of the United States, Appellee.

No. 13827.

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 10, 1957.

Decided Nov. 12, 1957.

Mr. Joseph J. Lyman, Washington, D. C., for appellant.

Mr. E. Tillman Stirling, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Thomas H. McGrail, Asst. U. S. Attys., were on the brief, for appellee.

Before WASHINGTON, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

Appellant in a declaratory judgment action asked the District Court to declare void deportation proceedings as conducted before the Board of Immigration Appeals. Cross motions for summary judgment having been filed, the Government's motion was granted, and appellant's motion was denied and his complaint was dismissed. This appeal followed. Pending hearing on the merits, we stayed deportation. Karayannis v. Brownell, 1957, 101 U.S.App.D.C. 220, 248 F.2d 80.

Appellant, a citizen and native of Greece, first entered the United States as a seaman in May, 1946. He married an American citizen in November, 1946. Some two years after the marriage, on his wife's petition to adjust his status as a permanent resident, appellant was granted the privilege of voluntary departure and pre-examination. He went to Canada on December 3, 1948, obtained a nonquota visa as the husband of an American citizen, and the following day returned to the United States.

In May, 1950, appellant's wife filed a complaint in the Supreme Court of New

York asking annulment of her marriage, and judgment granting the requested relief was entered January 8, 1951.

Deportation proceedings were instituted against the appellant in April, 1951, charging him with having entered the United States in violation of the Immigration Act in that when he entered the United States in December, 1948, he was not a nonquota immigrant [1] and that his visa had been obtained through fraud.[2] Hearings were conducted December 11, 1951. The Government called no witnesses except the former wife's lawyer through whom was introduced a transcript of the uncontested annulment hearing [3] before the New York court. The judgment recited "that the plaintiff [wife] is entitled to a judgment annulling the marriage * * * because of the fraud of the defendant," and further "that this judgment is interlocutory, but shall become the final judgment as of course three months after entry * * *. Upon this judgment becoming the final judgment, the said marriage shall be annulled * * *."

Before the Immigration Hearing Officer, appellant testified as to ill treatment by the wife and recited various threats; he lived with his wife from the time of their marriage in November, 1946, until September, 1949, some ten months after

obtaining his visa, separating then only because of her conduct toward him. He sought to testify in refutation of the wife's charges, as revealed by the record of the annulment proceedings, that he had refused to assume the status of a father or to perform the duties of a husband. The Hearing Examiner ruled that what might have been his defense to charges in the annulment proceeding had he appeared therein, "would be immaterial and in no way would affect this judgment so I will not permit them on the record."

Our decision must turn upon the interpretation and application of § 3 of the Act of May 14, 1937 (50 Stat. 164–165), set forth in the margin.[4] The Attorney General's brief tells us:

"* * * It is the Government's position that once it is shown that an alien who obtained a non-quota or preference quota visa by reason of his marriage to an American citizen, and it is further shown that this marriage was subsequently annulled because of the alien's fraud, then the alien is deportable."

As will be seen from our recital, the Government has inverted the purpose and the effect of the statute. The New York decree must be accepted as determining that the marriage was voidable

---

1. §§ 13(a) (3) and 14 of the Immigration Act of 1924, 8 U.S.C. §§ 213–214 (1946), now 8 U.S.C.A. §§ 1181(a), 1251, 1252.

2. § 3 of the Act of May 14, 1937, 8 U.S.C. § 213a (1946), now 8 U.S.C.A. § 1251 (c).

3. The transcript disclosed that, in sum, the plaintiff wife and her mother testified that appellant had told his wife in June, 1946, that he was a seaman illegally in this country; if he married an American citizen he would stay here; appellant promised that after a marriage, the parties would have children and that he would provide a home for the wife; they had no children; appellant instead, used contraceptives and had refused to have children; and next day after appellant had entered the United States from Canada, he told her he had never loved her; he had just wanted to stay in this country; and he packed his belongings

and left her, and never again lived with her.

4. "Any alien who at any time after entering the United States is found to have secured either non-quota or preference-quota visa through fraud, by contracting a marriage which, subsequent to entry into the United States, has been judicially annulled retroactively to date of marriage, shall be taken into custody and deported pursuant to the provisions of section 214 of this title on the ground that at time of entry he was not entitled to admission on the visa presented upon arrival in the United States. This section shall be effective whether entry was made before or after [May 14, 1937].

"When it appears that the immigrant fails or refuses to fulfill his promises for a marital agreement made to procure his entry as an immigrant he then becomes immediately subject to deportation."

because the court found a fraud had been worked upon the wife. Thus, the Government argues, the fraud upon the wife likewise constitutes a fraud upon the United States. It is claimed that the New York decree and the transcript of proceedings predicate a deportation order.

But the statute speaks against an alien who shall have been found to have secured the nonquota visa through fraud, fraud of a particular type to be sure, but fraud upon the United States nonetheless. Based upon the alien's November, 1946, marriage and following the 1948 amendment [5] his nonquota status was acquired. The statute [6] provides that deportation is to rest "on the ground that at the time of entry he was not entitled to admission on the visa presented upon arrival." The 1937 Act speaks of an alien "who at any time after entering the United States is found to have secured either non-quota or preference-quota visa through fraud. * * *" "The phrase 'at any time' qualifies the verb 'found,' "[7] and what is to be "found" is specifically, in so many words, directly related to his having secured the nonquota visa through fraud. The statute says nothing whatever to the effect that the marriage must have been "judicially annulled" because of fraud; indeed, any one of many grounds recognized in the various states might predicate annulment of a marriage. Moreover, an American wife's fraud due to incapacity to contract a valid marriage might well ground annulment proceedings and so eradicate the basis for the alien's nonquota status without constituting the slightest evidence that the visa had been procured by

the alien "through fraud." Of course, fraud may be practiced upon the Government in many ways.[8] Here the statute means that the nonquota visa must have been secured, not innocently, not unknowingly, but *through fraud* because of a marriage entered into for the purpose of achieving the preferential status of a spouse of an American, which marriage after the status has been gained and the alien has entered, must have been judicially declared void from its inception.

■ The Government offered no evidence of fraud upon its Immigration authorities. It called no witnesses. It chose to stand solely upon the decree which was properly received as evidence of termination of the marital rights of the parties. It is immaterial that the husband chose not to appear in the annulment proceedings of which he had notice. However valid the decree as between the parties, it did not bind the United States nor, as between the husband and the Government, did it conclude the husband's separable personal rights as distinguished from his marital rights.[9]

We may look by way of analogy to the Immigration and Nationality Act of 1952.[10] It is there provided that an alien shall be deported as having procured a visa by fraud and as one who is in the United States in violation of law "If (1) hereafter he or she obtains any entry into the United States with an immigrant visa * * * procured on the basis of a marriage entered into less than two years prior to such entry * * * and which, within two years subsequent to any entry of the alien * * * shall be judicially annulled or terminated, *unless such alien shall establish to the*

5. See the Act of May 19, 1948. Pub.Law 538, 80th Cong., 2d Sess., 62 Stat. 241, now 8 U.S.C.A. § 1101(a) (27) (A); "The purpose of the bill is to extend the date from July 1, 1932, to January 1, 1948, prior to which marriages of alien males to United States citizen women must have occurred in order to give them nonquota status." S.Rep. No. 1206, 2 U.S.Code Cong.Serv. 1555 (1948).

6. Supra note 4.

7. Kessler v. Strecker, 1939, 307 U.S. 22, 29, 59 S.Ct. 694, 698, 83 L.Ed. 1082.

8. See, for example, United States v. Shaughnessy, 2 Cir., 1951, 186 F.2d 580; Heizaburo Hirose v. Berkshire, 9 Cir., 1934, 73 F.2d 86; Darabi v. United States, 6 Cir., 1931, 54 F.2d 70.

9. Cf. Sutton v. Leib, 1952, 342 U.S. 402, 410, and note 17 at page 411, 72 S.Ct. 398, at page 404, 96 L.Ed. 448.

10. 8 U.S.C.A. § 1251(c).

*satisfaction of the Attorney General that such marriage was not contracted for the purpose of evading any provisions of the immigration laws * * *."* Not only the italicized language, but the House report [11] in explanation of this Act is specific that it is a procurement of the visa by fraud which is to be related to the voidable or terminable marriage "unless the Attorney General finds that the marriage was not contracted for the purpose of evading any of the provisions" of the Act. This clear and recent expression of Congressional intent is not without significance in our consideration of the impact of the language under which the present proceedings went forward.

We are satisfied that as a matter of law the Immigration authorities must here have misconstrued the Act and that the court should have declared the appellant entitled to a hearing in which the facts are to be found with the Act interpreted and applied as we have outlined.

Reversed and remanded for further proceedings not inconsistent herewith.

BASTIAN, Circuit Judge (dissenting).

I think the judgment in this case should be affirmed.

Briefly, the facts are that appellant came to this country in May 1946 as an alien seaman on a visitor's visa. He over-stayed his time. In November 1946 he married an American citizen, Mary Karayannis, and was permitted voluntary departure and re-entry on a non-quota visa issued to him solely by reason of his marriage.[1]

In 1950 Mary Karayannis filed complaint against appellant in the Supreme Court of New York for annulment of the marriage because of the fraud of appellant.

The complaint in that case alleged, and the testimony taken at the hearing of the annulment action established, that prior to the marriage defendant there (appellant here) had represented to his wife that he was in love with her and that he was entering into a *bona fide* marriage with her, and not one for the purpose of adjusting his alien status as the husband of an American wife. It was further alleged that immediately after the marriage he refused to enter into matrimonial relations with her, refused to support her, refused to provide a home for her, and threatened her with a dangerous instrument in order to make her execute documents to adjust his unlawful entry into the United States.

Karayannis did not appear or contest the annulment proceedings, although he knew of its pendency and was served with process as provided by the State of New York. He knew that Mary Karayannis obtained the judgment of annulment, and made no effort to have that judgment set aside or vacated. The decree of the New York court which annulled the marriage specifically sustained the allegations set forth in the complaint.

Thereafter deportation proceedings were instituted against appellant under the so-called "gigolo bill," which reads in part as follows:

" * * * any alien who at any time after entering the United States is found to have secured either non-quota or preference-quota visa through fraud, by contracting a marriage which, subsequent to entry into the United States, has been judicially annulled retroactively to date of marriage, shall be taken into custody and deported * * *."[2]

A hearing was held before a Hearing Officer of the Immigration and Naturalization Service at which Karayannis appeared and admitted that he had known of the pendency of the annulment proceedings, and knew that Mary Karayannis had obtained an annulment decree. He denied the allegations made by her and said he did not obtain a lawyer "because at that time I didn't have any money to engage a lawyer and *I had to*

---

11. No. 1365, 82d Cong., 2d Sess. 61 (1952), to accompany H.R. 5678.

1. Immigration Act of 1924, 43 Stat. 155.

2. § 3, Act of May 14, 1937, 50 Stat. 165.

*keep on working where I was employed."* (Emphasis supplied.) Appearing also before the Hearing Officer was Mary Karayannis' attorney in the annulment proceedings, who testified that the transcript of the record presented to the Hearing Officer was a true and correct transcript of the testimony at the annulment proceedings on which the New York court sustained the allegations of the annulment complaint. Thereafter the Hearing Officer entered findings of fact and conclusions of law holding that, under the above quoted Act, Karayannis was deportable. Karayannis duly appealed to the Board of Immigration Appeals, which in due course ruled against him.

Karayannis thereupon filed the instant proceeding against the Attorney General to enjoin his deportation. On cross motions for summary judgment, appellant's motion was denied, appellee's motion was granted, and the complaint was dismissed. This appeal followed.

In my opinion, the statute is entirely clear and means exactly what it says, namely, that any alien who has secured his passport by the fraud of contracting a marriage which, subsequent to entry into the United States, has been judicially annulled retroactively to the date of the marriage, shall be taken into custody and deported. If this language is not clear enough (and I think it is), a reading of the legislative history of § 3 of the Act makes it as clear as crystal. In the House Report on the bill (H.R. 28) it was stated, H.R.Rep. No. 65, 75th Cong., 1st Sess. (1937): [3]

> "The primary purpose of this bill is an effort to protect American citizens from the embarrassments resulting from marriages to aliens who fraudulently scheme to enter into such marriages solely to secure for themselves, as the spouse of an American citizen, either a nonquota visa or a preference-quota visa and thereby expedite the admission of such alien spouse to the United

States. It is hoped that the deportation penalty contained in this bill will serve as an effective deterrent to such fraudulent visa practices.

> "This bill does not bring within its purview cases in which divorce, separation, or abandonment is the action by which such marriages between alien and citizens are terminated. Only the judicial annulment of such marriages by an American court, retroactively to the date on which such marriages were contracted, justifies deportation of the alien spouse under the provisions of this bill.

> \*   \*   \*   \*   \*

> "Within the above-cited limitation, relating to the annulment of the marriage, section 3 of this bill provides mandatory deportation of any alien found in the United States in whose case admission to this country was secured through a marriage to a citizen and the issuance of nonquota or preference-quota visa whenever the marriage is annulled, thereby voiding the marriage as of date it was originally contracted and removing from the alien spouse any validity for the application for or issuance of the nonquota or preference-quota visa; and such deportation is directed pursuant to the provisions of section 14 of the Immigration Act of 1924."

In the debate in the House of Representatives, Representative Eberharter spoke as follows:

> "The third section of the bill \* \* \* states that any marriage which is judicially annulled retroactively to date of marriage shall be evidence of fraud and *cause for deportation."* 81 Cong.Rec. 648. (Emphasis supplied.)

After further consideration by the Committee on Immigration and Naturalization, Chairman Dickstein explained in the House of Representatives:

3. Identical language appears in S.Rep. No. 426, 75th Cong., 1st Sess. (1937) on the same bill, and in the House Report on the same bill in the 74th Congress.

"Any decree of divorce based on fraud will automatically take such alien and send him back to his native land."[4]  81 Cong.Rec. 2350.

That the marriage of this appellant to Mary Karayannis was judicially annulled retroactively to the date of marriage is made clear by the case of Matter of Moncrief's Will, 1921, 235 N.Y. 390, 139 N.E. 550, 551, 27 A.L.R. 1117. The court there pointed out the difference between a void marriage and a voidable marriage. It pointed out that a void marriage at no time and under no circumstances has any effect; it is a nullity and may be attacked directly or collaterally. The court then pointed out that a voidable marriage is valid unless it is attacked by the parties seeking to void it and, until this is done, it is binding but, when declared void by a decree of court, is "void from the beginning." The court added:

"These provisions resolved any doubt as to whether a marriage induced by fraud was void or voidable. But was it the intention also to alter the rule that when the decree was pronounced the marriage was void *ab initio?* We fail to find evidence of such intent. The marriage shall be void from the time its nullity shall be declared by a court. Consent is essential to the contract. No consent; no marriage. The court finds no consent. It therefore nullifies the marriage. It declares there was no marriage. From that moment the marriage is void. As we have seen, a void marriage is void for all purposes from its inception. All that was meant was that no longer might husband and wife upon their own responsibility determine that they were free from the contract. Such a determination required the concurrence of the court. Only when that was obtained did the marriage become void. *But when it was obtained the marriage was nul-*

lified, and all the consequences of a void marriage then followed." At page 394 of 235 N.Y., at page 551 of 139 N.E. (Emphasis supplied.)

That opinion was followed and cited with approval in the case of Sleicher v. Sleicher, 251 N.Y. 366, 369, 167 N.E. 501, 502, in an opinion by then Chief Judge Cardozo, from which the following is quoted:

"A marriage procured by fraud is voidable, not void. Even so, annulment when decreed, puts an end to it *from the beginning* Matter of Moncrief's Will, 235 N.Y. 390, 139 N.E. 550, 27 A.L.R. 1117 * * *. It is not dissolved as upon divorce. It is effaced as if it had never been. From then on, payments to either spouse may be demanded and must be made on the footing of its nullity. This is true, according to the holding of some courts, where bequests of income are to be paid until remarriage. * * * It is true and for like reasons where installments of alimony are to be paid under a judgment. *A marriage is unreal if procured by force or fraud.*"[5]  (Emphasis supplied.)

I cannot see how, in the face of the plain language of the statute, its legislative history, and the decisions of the State of New York, it can be said that appellant is not deportable. Such a ruling allows a man who would otherwise not be eligible for legal entry into this country to fraudulently avoid the quota provisions of the law and stay here, whereas others must wait until their turn is reached.

It is argued that the fraud, if any, was not in obtaining the nonquota visa but in the marriage. However, as pointed out by Circuit Judge Prettyman when he dissented from the order staying the deportation of this man:

"But he obtained the visa solely on the basis of the marriage. The

---

4.  Obviously, annulment was meant.

5.  The construction placed by the New York courts as to the effect of a decree

of annulment making the marriage void *ab initio* is followed by many other courts, e. g., New Jersey, Wigder v. Wigder, 188 A. 235, 14 N.J.Misc. 880.

marriage was a fraud; that is, the basis for the visa was a fraud. He obtained the visa through a fraud in contracting a marriage. That is precisely what the statute, in mandatory language, says requires deportation."[6]

Every element necessary to authorize deportation under the statute is present here. The fact that the annulment was granted on the ground of fraud cannot be denied. We should not permit a collateral attack on a valid judgment of a sister state. Appellant was given the benefit of due process; the findings in the deportation proceedings are supported beyond any doubt by the evidence. No reason exists why this man should not be deported.

6. 101 U.S.App.D.C. 221, 248 F.2d 81.