**Aurora Gazmin NAVARRO, Plaintiff-Appellant,**

v.

**DISTRICT DIRECTOR OF the UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Defendant-Appellee.**

No. 76–1779.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1976.*

Decided Sept. 13, 1977.

---

* After oral argument April 5, 1976, it became evident that the appeal must be dismissed. A judgment was later entered and a new appeal taken and considered without further briefs or oral argument. See *Navarro v. Dist. Dir. of U. S. Immig. & Natural. Serv.*, 539 F.2d 661 (7th Cir. 1976).

See also, 7 Cir., 539 F.2d 611.

Renato L. Amponin, Chicago, Ill., for plaintiff-appellant.

Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, PELL, Circuit Judge, and WYZANSKI, Senior District Judge.**

WYZANSKI, Senior District Judge.

In the District Court for the Northern District of Illinois plaintiff filed this action against the District Director of the United States Immigration and Naturalization Service. Jurisdiction was alleged on the basis of the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. § 701. Summarily stated the questions presented relate to the continued validity of the October 4, 1971 notice issued to plaintiff, Aurora Gazmin Navarro, by defendant District Director, informing her that her petition for preference classification under § 203(a)(3) of the Immigration and Nationality Act, as amended, 8 U.S.C. § 1153(a)(3), had been approved.

Before we state the facts with respect to Mrs. Navarro, it will be helpful to outline the framework supplied by the Immigration and Nationality Act, hereafter called the Act, and some decisions thereunder.

It is hornbook law that an alien may be admitted to the United States as an immigrant for permanent residence or as a non-immigrant for a brief period and that, after admission to the United States in the latter status, transfer to the former status depends ordinarily on departure from the United States and reapplication to a consul for entry as an immigrant, although in particular situations departure from the United States may not be required.

Within both the immigrant and non-immigrant groups, Congress has established preferred classes. With respect to both groups, the Congress, with an important exception, has excluded those who enter pursuant to a contract to labor in the United States. Section 212(a)(14) of the Act; 8 U.S.C. § 1182(a)(14). That exception to "the contract labor" barrier exists where "the Secretary of Labor has determined . . . that (A) there are not sufficient workers in the United States who are able, willing, qualified, and available at the time of application for a visa . . . and at the place to which the alien is destined to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed."

Whether one originally sought entry as an immigrant, or, being a non-immigrant then sought to become an immigrant, he may qualify for preference in the granting of a visa for immigration as a permanent resident, pursuant to § 203(a)(3) of the Act, 8 U.S.C. § 1153(a)(3), which provides:

"Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a)(ii) of this title, to qualified immigrants who are members of the professions . . ."

Section 101(a)(32) of the Act, 8 U.S.C. § 1101(a)(32) provides that "[t]he term 'profession' shall include but not be limited to architects, engineers, lawyers, physicians, surgeons, and teachers in elementary or secondary schools, colleges, academies, or seminaries."

As the government's brief concedes, nursing has been recognized by administrative regulations as a profession which qualifies for third preference classification. 29 C.F.R. 60.7. But the government does not concede that admission of an alien to the practice of the nursing profession in a foreign country, which issued its license acting on the basis of a successful completion of a post-secondary course of education and a diploma from a recognized institution of higher learning, permanently makes, for the purposes of § 203(a)(3), the alien one of the "members of the professions." It is the government's contention that to be a member of the professions for the purpose of § 203(a)(3), an alien who is within the United States (even if she is licensed in her home country to practice her profession) is

---

** Senior District Judge Charles E. Wyzanski, Jr. of the District of Massachusetts is sitting by designation.

no longer qualified as a member of that profession if she has been here for some time and has not yet passed local United States professional examinations. Reliance by the government is on its reading of *Diaz v. District Director,* 468 F.2d 1206 (9th Cir. 1972); *Asuncion v. District Director,* 427 F.2d 523 (9th Cir. 1970); *Pizarro v. District Director,* 415 F.2d 481, 482 (9th Cir. 1969); and *Tang v. District Director,* 298 F.Supp. 413 (C.D.Cal.1969). But see *Matter of Ulandy,* 13 I. & N.Dec. 729. It is with this contention of the government in mind that we now turn to what is necessarily a rather lengthy statement of the facts in the instant case.

Plaintiff, Mrs. Navarro, was born June 7, 1947, a native citizen of the Philippines. She married a Filipino. In 1963 she completed a four-year secondary school training at St. Mary's Academy, and in April 1968 received on the basis of 5 years' study, from Dagupan Colleges School of Nursing in the Philippines, a diploma as a graduate nurse. The official transcript of the courses she took during those 5 years indicates a curriculum comparable to that of an American nursing school.

In the Philippines plaintiff received from the government a license to practice as the equivalent of a registered nurse. She was from August 1968 to September 1969 a staff nurse "to give good comprehensive nursing care" at Perpetual Succour Hospital, a private hospital, and then was from March 1970 to January 1971 a staff nurse at San Lazaro Hospital, a government hospital.

January 18, 1971, the United States Department of State issued to plaintiff (under her unmarried name) a certificate of eligibility for exchange visitor status which enabled her to engage from February 1, 1971 to January 31, 1972 at Kansas City General Hospital and Medical Center in "an approved course in graduate nurses' training for qualified foreign nurses, to enable such foreign nationals to pursue training in their respective fields in the United States and to promote the general interests of international exchange."

On the reverse side of each Departmental certificate of eligibility for exchange visitor status is a further certificate to be executed by the person covered. While from the copy in the record before us it is not clear that plaintiff did sign her own certificate on the reverse side of the January 18, 1971 Departmental certificate, it plainly appears that on May 28, 1971 she signed the reverse side of a second or replacement certificate issued to her on that day, which set forth her married name and which had been substituted in accordance with her request for the correction of the January 18, 1971 certificate. The reverse side of each Departmental certificate is headed "Certificate of Exchange Visitor Under Section 101(a)(15)(j) of the Immigration and Nationality Act, As Amended." In Item 8 of her certificate, plaintiff said she understood "that the following conditions are applicable to exchange visitors: (b) *Limitations on Stay:* Graduate nurses—2 years; [and] (e) *Two-Year Foreign Residence Requirement:* Section 212(e) of the Immigration and Nationality Act provides as follows:

No person admitted under section 101(a)(15)(j) or acquiring such status after admission shall be eligible to apply for an immigrant visa, or for permanent residence, or for a nonimmigrant visa under section 101(a)(15)(H) until it is established that such person has resided and been physically present in the country of his nationality or his last residence, or in another foreign country for an aggregate of at least two years following departure from the United States: *Provided,* That such residence in another foreign country shall be considered to have satisfied the requirements of this subsection if the Secretary of State determines that it has served the purpose and the intent of the Mutual Educational and Cultural Exchange Act of 1961 (foreign residence should be in a country having at least as great a need for your skills as the country of your nationality or last residence): *Provided further,* That upon the favorable recommendation of the Secretary of State, pursuant to the request of an in-

terested United States Government agency, or of the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien), the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest: *And provided further,* That the provisions of this paragraph shall apply also to those persons who acquired exchange visitor status under the United States Information and Educational Exchange Act of 1948, as amended."

The Secretary of Labor, acting under the previously cited § 212(a)(14) of the Act, had presumably already determined that (A) there were not sufficient nurses in the United States, and (B) the employment of alien nurses would not adversely affect the wages and working conditions of American workers. Having the advantage of that determination, and having the Secretary of State's certificate of eligibility for exchange visitor status, plaintiff lawfully entered the United States as a non-immigrant on February 10, 1971. Her husband later lawfully entered the United States.

As foreshadowed in the certificate she had received from the State Department, plaintiff went to work in February 1971 at the Kansas City General Hospital and Medical Center where she remained until August 1972. From August 1972 to November 1973 she was a nurse at Trinity Lutheran Hospital, Kansas City, and then she worked in the same city from January 1974 to March 8, 1974 at Bethany Hospital and Medical Center. She is presently working as a nursing technician at Northwest Hospital, Chicago, Illinois.

While she was at the Kansas City General, she on August 11, 1971 filed with the INS, in supposed accordance with § 203(a)(3) of the Act, a petition for classification as what is called a "third preference immigrant," that is, "an alien who is a member of the professions." She disclosed that she was "now in the U. S. . . . as an Exchange Visitor Nurse" and that she would "apply for adjustment of status to that of a lawful permanent resident in the office of the Immigration and Naturalization Service at Kansas City, Mo."

October 4, 1971, on Form 1–464E (Rev. 2–1–71)N, the INS sent to plaintiff a "Notice of Third . . . Preference Petition Approved Under Section 203(a)" of the Act. In the text of the notice was a box with the heading "Validity" and with the assurance that "[t]he approval of a petition for third or sixth preference classification is valid for as long as the supporting labor certification is valid and unexpired, provided in the case of a petition for third preference classification there is no change in the beneficiary's intention to engage in the indicated profession . . . " It was further noted, "The petition has been approved. The petition states that the beneficiary is in the United States and will apply for adjustment of status to that of a lawful permanent resident. A visa number is not presently available; therefore, the beneficiary may not apply for adjustment of status to that of a permanent resident. The beneficiary has been or will be notified concerning his stay in the United States."

An undated, unsigned Form 1–461 (Rev. 1–27–70), on the stationery of the INS, reached plaintiff possibly together with, or shortly before or after, Form 1–464E (Rev. 2–1–71)N. The opening paragraph informed plaintiff that:

"The preference visa petition filed in your behalf has been approved. However, an immigrant visa is not now available to you. Therefore, you are not eligible at this time to apply for adjustment of your status to that of a lawful permanent resident. Under the circumstances you are hereby granted permission to remain in the United States until further notice. Continuation of this privilege is conditioned upon your retention of the status established in the approved petition."

It should be noted that the just-quoted grant of permission to remain in the United States appears only in an apparently unsigned letter and is not mentioned in the October 4, 1971 Form 1-464E (Rev. 2-1-71)N.

After plaintiff's contract with the Kansas City General ended, she applied to the Missouri State Board of Nursing to take its state examinations. That board refused to allow her to take the 1971 examination because she had not studied sufficient psychiatry. In 1972 she completed her units in psychiatry by taking courses at Penn Valley Community College. Plaintiff then took in December 1972 and again in March 1973 the state nursing examinations. She passed the Medical, Pediatric, and Obstetrics examinations, but failed the Surgical and Psychiatric examinations. Nonetheless, the Missouri State Board of Nursing approved the Trinity Lutheran Hospital's hiring plaintiff as an unlicensed practical nurse.

According to plaintiff's evidence, the state board did not allow plaintiff to take the examinations in June 1973 because there were too many applicants. But the Board advised her to take them in September, 1973.

July 11, 1973, the District Director wrote plaintiff as follows:

Mrs. Aurora Gazmin Navarro
6307 Bellefontaine Street
Kansas City, Missouri

Dear Mrs. Navarro:

On September 20, 1971, your petition to accord you third preference status as a registered nurse was approved, and you were permitted to remain in the United States pending availability of a visa number. Although you have been in the United States since February 10, 1971, you have not yet been licensed as a registered nurse by the Missouri State Board of Nursing.

Since you have failed to qualify as a registered nurse in over two years following entry, it does not appear you should have been accorded third preference; and this office contemplates revocation of the approved visa petition. You may furnish evidence by July 31, 1973, as to why you do not think the petition should be revoked. If the petition is revoked, you will have the right of appeal to the Regional Commissioner of this Service.

Sincerely,

H. I. Major
District Director

However, in the October 4, 1971, notice to plaintiff of the approval of her third preference status, dated September 20, 1971, as stamped on the face of plaintiff's visa petition, there is no stipulation that plaintiff, in order to retain the benefits of the approved petition, must, under the law of the United States, "qualify as a registered nurse" within a particular period of time, or indeed ever. And, more important, the INS does not explicitly reserve the right to revoke the petition, but merely indicates that validity continues so long as "there is no change in the beneficiary's intention to engage in the indicated profession," and so impliedly limits the INS's right of revocation, or more exactly, the alien's right of continued use only with respect to that specified condition.

July 17, 1973 plaintiff, in reply to the District Director's letter, set forth alleged facts as to why her approved third preference petition should not be revoked.

July 23, 1973 the Director in a letter to plaintiff, apparently incorrectly, stated that "[a]t the time your third preference petition was approved, it was with the understanding you would meet the requirements for licensure within a reasonable time." There is no indication that such an "understanding" by plaintiff ever existed, nor that there had been promulgated regulations in which the INS had so interpreted the law. At the most, it may be claimed that if plaintiff failed to secure within the United States a license to practice nursing she ran the risk of deportation. *Bowes v. District Director*, 443 F.2d 30 (9th Cir. 1971); *Manantan v. INS*, 425 F.2d 693 (7th Cir. 1970).

November 13, 1973, following Mrs. Navarro's third unsuccessful attempt to pass

the Missouri nursing examination, the District Director gave this explanation of his action:

On July 11, 1973, you were put on notice of our intention to revoke your third preference petition approved September 20, 1971, because you had not qualified as a registered nurse in the state of Missouri. Because of your representations that you had been approved to rewrite the Missouri State Board of Nursing examination in September, 1973, you were informed that a decision would be deferred pending results.

Your petition for third preference was approved because you claimed you expected to be employed as a member of the professions. Inasmuch as you again failed to pass the licensure test of the Missouri State Board of Nursing on September 12–13, 1973, you have not as yet qualified as a registered nurse, but have had to accept employment in a lesser capacity. Since you entered the United States on February 10, 1971, to take Graduate Nurse Training, it is believed you have had ample opportunity to qualify as a registered nurse.

You have failed to establish that you qualify as a member of the professions as outlined in Section 203(a)(3) of the Immigration and Nationality Act, as amended.

Plaintiff appealed to the Regional Commissioner. January 23, 1974, the Regional Commissioner "upheld" the District Director's decision, and on August 26, 1974, he, with opinion, denied a motion to reconsider. Meanwhile, February 8, 1974 the District Director, on Form 1–210 (Rev. 9–1–70)N, notified plaintiff that she was "required to depart from the United States . . . on or before March 8, 1974."

While these legal steps were being taken, plaintiff had two children born in the United States: the first on June 15, 1972 during the two-year period following her original petition, and the second on November 22, 1974, after the Regional Commissioner's decision.

Following the Regional Commissioner's refusal to reconsider his decision, plaintiff brought this action, October 16, 1974, against defendant District Director. The latter filed a motion to dismiss the complaint and for summary judgment. July 17, 1975 the District Judge granted the motion for reasons set forth in an accompanying memorandum. While expressing the view that plaintiff had proceeded improperly and prematurely, that she should have awaited a deportation order, and that she presented no actual case or controversy, the judge, nevertheless, declared that "the complaint fails to allege any basis for finding that the action of the District Director of the Immigration and Naturalization Service was arbitrary or capricious, or was in excess of his legal authority."

From the District Court's judgment dismissing the complaint, plaintiff has appealed to this Court.

The initial question is whether the District Court correctly held that it had no jurisdiction of this case because the only available judicial remedy for Navarro was to await a deportation order and then, if she chose, to petition for a writ of habeas corpus.

■ We differ from the District Court's conclusions on jurisdiction. What plaintiff now seeks includes a declaration that, by virtue of the notice of October 4, 1971 on Form 1–464E (Rev. 2–1–71)N, she has a valid effective, unrevoked third preference status. If she does, it follows that when a visa does become available at a consular office she, no matter where she is then living, will have a priority in securing that visa, if she is otherwise qualified for entry. Independently, of deportation, this is a valuable right. We are of opinion that the Declaratory Judgment Act, 28 U.S.C. § 2201, furnishes a basis for her invocation of federal question jurisdiction, 28 U.S.C. § 1331(a), to have this right declared, and that she need not await a deportation order.

We do not rely for jurisdiction on the Administrative Procedure Act, inasmuch as

that channel of review seems blocked by the opinion and judgment in *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192, Sup.Ct. of the U.S., Oct. Term 1976, No. 75–1443, 1977.

■ While this Court has jurisdiction to determine plaintiff's right to maintain the status conferred upon her by the October 4, 1971 notice, we must make our determination upon the administrative record before the INS. Cf. *Song Jook Suh v. Rosenberg,* 437 F.2d 1098, 1102 (9th Cir. 1971); *Wang Ching Shek v. Esperdy,* 304 F.Supp. 1086 (S.D.N.Y.1969). We do not agree with the implications in plaintiff's prayers that the District Court was empowered to conduct a *de novo* hearing to determine "whether the plaintiff . . . is eligible and qualified for Third Preference Status" or whether plaintiff is "a professional as said term is defined in Section 203(a)(3)" of the Act. See *Kessler v. Strecker,* 307 U.S. 22, 59 S.Ct. 694, 83 L.Ed. 1082 (1939).

Bearing in mind that it is the executive branch of the government which initially determines whether to issue a warrant for arrest of an alien believed to be deportable and which, in appropriate cases, issues warrants for deportation, and recognizing that an order directing an alien to depart does not purport to be either a warrant for arrest or a warrant for deportation, we see no basis for the prayers in plaintiff's complaint asking the District Court to "review the record of the Administrative body and its order directing the departure of the plaintiff" and "restraining the defendant from enforcing the departure of the plaintiff . . . from the United States pending the final determination of the case." See *Kladis v. INS,* 343 F.2d 513, 515 (7th Cir. 1965). If the pleading had been properly drawn, the District Court no doubt would have seen that it had federal jurisdiction limited to the issues as to what status if any plaintiff had as a result of the October 4, 1971 notice and of the later administrative attempts at some kind of revocation of an approved petition.

■ Coming to the merits of the issues before us, we are faced with the text of the October 4, 1971 notice and what appears to be a contemporary letter on the stationery of INS. As clearly as words can state, the notice says that the status of third class preference is "valid for as long as the supporting labor certificate [*i. e.,* the certificate of the Secretary of Labor] is valid and unexpired, provided in the case of a petition for third class preference classification there is no change in the beneficiary's intention to engage in the indicated profession." What are made the tests and the sole tests of continued validity are first, continuation of the Secretary of Labor's certificates, and second, continuation of the beneficiary's intention to engage in the indicated profession.

In the case at bar there is no suggestion that the Secretary of Labor's certification has not continued. Nor can there be a plausible basis for claiming that the beneficiary no longer has the intention to engage in the nursing profession. She has a diploma from an institution of higher learning in the Philippines; she has from the Philippine government a nursing license; she has years of nursing service in the Philippines and here; she has with regularity been taking nursing board examinations; she has passed 3 out of 5 parts of those examinations; she intends to keep on trying; and, for all we know, when she moved to Illinois she may have opened up a possibility of facing examinations which would for her be easier than those of Missouri which she failed. She is today engaged as a nursing technician at a well-known Chicago hospital.

Furthermore, the INS has purported to revoke the plaintiff's status not only on a ground not expressly reserved in the notice which conferred status, but on a ground that is, to say the least, not self-evidently rational. It is by no means presumptively true that persons who fail professional examinations 3 or 4 times will never pass such examinations and be duly accredited. We have no intention of spreading on the rec-

ord the names of professionals, some who later had conspicuous success, who did not get their licenses until they had failed on several different tries to pass examinations set by professional boards.

Moreover, it is by no means clear to us that § 203(a)(3) furnishes support for the view of the INS that in order to be a member of a profession, within the meaning of that section, an alien who, as a result of (1) a diploma based on a course of study at a recognized institution of higher learning in a foreign country, (2) a license, and (3) actual authorized practice in that country, is an accredited member of the profession in that country, must also qualify as a member of the profession in some part of the United States. However, we need not now decide, and do not decide, that troublesome point, for it has not been fully argued before us.

All we need here to decide is that defendant did not have authority to revoke the October 4, 1971 notice on the ground that he gave, nor on the grounds given by the Regional Commissioner. Both those officials took the position that a candidate for admission to practice her profession in the United States is no longer to be regarded as a good faith candidate if within two years she has failed to secure an American license in her calling due to repeated failures to pass state examinations for admission which she intends to continue to seek to pass, in efforts promptly to be undertaken, in accordance with (as is the case in Missouri) state law which permits successive tries by hitherto unsuccessful applicants. We also note that so far as appears plaintiff may have the possibility of taking, and the intention to take, examinations in Illinois where she now is a nursing technician.

However, we are troubled by a point which, so far as we are informed by the record and briefs, no one has yet addressed. Plaintiff, entered the United States as part of a program which, as her certification plainly revealed, was designed to train her for future work not in the United States but in her country of origin. That program is concerned with improving the capability of underdeveloped countries. When plaintiff sought to enter the United States under this program in an exchange visitor status, pursuant to § 101(a)(15)(J) of the Act, she certified that she understood that she was limited to a maximum stay of two years, and that, with exceptions that seem not to be material here, she was not to be "eligible to apply for an immigrant visa . . . until it is established that such person has resided and been physically present in the country of his nationality or his last residence or in another foreign country for an aggregate of at least two years following departure from the United States."

We, sitting on appeal with a skimpy record, cannot feel sure whether this quoted language forecloses plaintiff from securing the preferences allowed by § 203(a)(3). We are uninformed of the State Department's construction of, and the legislative history of § 101(a)(15)(J). We do not have presented to us arguments as to whether the language of § 101(a)(15)(J) and its underlying policy, interpreted with the sympathy and breadth to which they may be entitled, inhibit not merely the immediate eligibility of an exchange visitor to an American immigration visa but also the immediate eligibility of an exchange visitor to secure the priority inherent in a successful petition for third preference classification under § 203(a)(3) of the Act.

Nor can we, who have heard neither evidence nor argument on the relevant points, feel confident that if § 101(a)(15)(J) of the Act precluded plaintiff from rightfully securing the status of a § 203(a)(3) preference classification, plaintiff, as the complaining party in the District Court, should now be denied relief.

In this uncertain state, we deem it appropriate merely to vacate the District Judge's judgment, to remand the case to the District Court with instructions to permit the parties to amend their pleadings, offer evidence, and make arguments in the light of

the problems which we have indicated seem to us inherent in this case.

Nor do we prohibit the INS from taking in the interim any suitable independent administrative action, by deportation or otherwise (See *Manantan v. INS, supra* ), or from bringing an independent court action which may be suggested by the doubts we have expressed.

*Judgment of the District Court vacated; case remanded to the District Court for proceedings consistent with this opinion.*

PELL, Circuit Judge, dissenting.

The possibility that foreign citizens admitted to this country only because their professional skills are needed here might never have to qualify to use them seems to have aspects of whimsicality which even Congressional critics would have difficulty in attributing to the Congress. I recognize that the nature of the preference system is such that people frequently apply for this entree while residing outside the United States and would not at the time their applications are processed have been certified by American licensing authorities. No doubt, therefore, a suitable period for study and licensing is implicit in that system. But insofar as the court's statement that the "defendant did not have *authority* to revoke the October 4, 1971 notice on the ground that he gave," *ante* at 1032 (emphasis added), implies that a preference once given is irrevocable despite repeated failures of the applicant to obtain the sine qua non of practicing his or her profession in this country, I respectfully dissent. Nothing in the pertinent statute limits such authority, which I think is implicit in the rationale of the professional preference system. I would also note my view that this issue, which the majority opinion purports not to decide because it was not "fully argued before us," *ante* at 1032, was in fact exactly the question presented by the parties' briefs and argument.[1]

The result of the majority opinion seems to be that the Government, having failed in the October 4, 1971, notice to make express its understanding that appellant would have to qualify to practice her profession here within a reasonable time, is now estopped to assert such a basis for revoking her preference. From this aspect of the opinion, also, I must dissent. As a general matter, the United States is not subject to an estoppel which impedes the exercise of its governmental functions. 28 Am.Jur.2d *Estoppel and Waiver* § 132, at 799–802 (1966). There is surely no reason to think this rule less applicable in immigration matters. *See Tang v. District Director of the U.S. Immigration and Naturalization Service,* 298 F.Supp. 413, 419–20 (C.D.Cal.1969), and cases cited therein. Moreover, even if an estoppel were somehow permissible in this context, appellant proffers, and I perceive, no significant basis for concluding that she relied to her detriment on the failure of the October 4 notice to specify the expectation that appellant would obtain a license.

In sum, the majority's primary reliance on the lack of explicit expression in the Government's notice of October 4, 1971, appears to me to be an extreme example of *qui non negat fatetur.*

Accordingly, while I agree with the court that the district court had jurisdiction of the case, I would affirm the judgment dismissing the complaint.

---

1.  I recognize that no abundance of case authorities was cited to us, and apparently such does not exist, but this would not seem to equate with a lack of full argument.