## MATTER OF SOSA

### In Exclusion Proceedings

### A–30269209

*Decided by Board February 6, 1976*

Applicant, who was admitted to the United States for permanent residence in April 1972 in possession of an immigrant visa issued on the basis of his marriage to a United States citizen on December 4, 1971, but who ceased living with his wife very shortly after the marriage and was separated from her at the time he obtained his visa and was admitted to the United States, did not have a viable marriage at the time of his visa application and admission to this country and, therefore, his immigrant visa was invalid (*Matter of Gonzalez-Portillo*, 13 I. & N. Dec. 309, distinguished). Accordingly, applicant, upon return to this country in 1974 following an absence to Mexico of approximately one year, is not entitled to status as a returning resident alien and is excludable under section 212(a)(20) of the Immigration and Nationality Act for lack of a valid immigrant visa.

EXCLUDABLE:  Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20)]—Immigrant—no visa

ON BEHALF OF APPLICANT:
Allan C. Skinner, Esquire
Post Office Box 625
Laredo, Texas 78040

ON BEHALF OF SERVICE:
Richard M. Casillas
Trial Attorney

The applicant appeals from the August 12, 1975 decision of the immigration judge finding him excludable under section 212(a)(20) of the Immigration and Nationality Act as an immigrant without a valid immigrant visa. The appeal will be dismissed.

The facts are set forth in detail in the immigration judge's opinion and need not be repeated at length. Suffice it to say that the applicant married a United States citizen on December 4, 1971, and on the basis of that marriage was admitted to the United States as a lawful permanent resident in April 1972. The Immigration and Naturalization Service does not challenge the validity of that marriage. However, the applicant ceased living with his wife very shortly after they were married, and the immigration judge found that at the time the applicant originally applied for admission to the United States in April 1972 "he did not have a viable marriage and therefore did not have a valid immigrant visa." The immigration judge concluded that the applicant had not proved by a preponderance of the evidence that he was admissible to the United

States as a returning resident because at the time of his original admission as a permanent resident he was not eligible for an immigrant visa.

The applicant was admitted to the United States as a permanent resident in April 1972. He left this country on February 17, 1973, intending to take a two-month vacation in central Mexico, but he did not seek to reenter the United States until March 26, 1974. Because he had established a colorable claim to returning resident status, it was the Government's burden to show why the applicant should be deprived of that status. *Kwong Hai Chew v. Colding,* 344 U.S. 590 (1953); *Chew v. Rogers,* 257 F.2d 607 (D.C. Cir., 1958); *Matter of Kane,* Interim Decision No. 2371 (BIA 1975).

The Service contends that the applicant obtained permanent resident status by misrepresentation because he failed to divulge his separation from his United States citizen wife during the entire visa-issuing process. The Service does not dispute the validity of the marriage at its inception, *i.e.,* it does not contend that the marriage was a sham; however, the Service maintains that the marriage was not viable and, therefore, that the visa would have been denied had the true facts been known. As it is not contended that the marriage was a sham, the *Bark* case,[1] referred to by counsel, is inapposite.

At the exclusion proceeding when the applicant was asked whether at various relevant times he was living with his wife as husband and wife, he answered that he was not, but that he was trying to and begging her to live with him. His counsel states that it was not until he finally sought a divorce in 1973 that he gave up his hope and efforts for a reconciliation. It does not appear from the record, however, that the applicant's wife ever gave him reason to believe that they would be reconciled or that his hopes of reconciliation were realistic.

The complaint and judgment of divorce show that the applicant, who was the plaintiff in that action, and his wife lived together for only one week after their marriage; that the marriage was never consummated; and that the applicant's wife refused to live with him. Thus, this case is distinguishable for *Matter of Gonzalez-Portillo,* 13 I. & N. Dec. 309 (BIA 1969). In that case, although the respondent had been separated from his wife at the time of original entry, he was not found to have been excludable at entry because he had had a reasonable belief that he and his wife would be reconciled. In the present case the marriage was dead before the applicant obtained his visa and entered the United States in April 1972.

An alien spouse of a United States citizen can acquire lawful permanent resident status without regard to numerical limitations under

---

[1] *Bark v. INS,* 511 F.2d 1200 (C.A. 9, 1975), which has replaced the decision cited by counsel. In *Bark,* the issue was whether or not the marriage in question was a sham.

section 201(b) of the Immigration and Nationality Act. This provision was included in the Act in order to prevent the separation of families and to preserve the family unit. H.R. Rept. No. 1365, 82d Cong., 2d Sess. 1680 (1952). Immigration benefits will not be conferred on the basis of a nonviable or a terminated marriage, because the Congressional purpose would not then be served. *Matter of Lew,* 11 I. & N. Dec. 148 (D.D. 1965). See *Matter of Harris,* Interim Decision No. 2336 (BIA 1974). We agree with the immigration judge in this case that the applicant's marriage to a United States citizen was not viable at the time he applied for an immigrant visa and sought admission to the United States and that, therefore, his immigrant visa was invalid.

In exclusion proceedings it is the applicant's burden to show that he is admissible to the United States, section 291, Immigration and Nationality Act, although as stated above, in the case of a returning resident the burden falls upon the Service to prove that a person with a colorable claim to such status is not entitled to it. *Kwong Hai Chew* v. *Colding, supra; Chew* v. *Rogers, supra; Matter of Kane, supra.* We find that, by the evidence presented, the Service has borne its burden to establish that the applicant was not a returning resident, and that the applicant has not proven that he is otherwise admissible to the United States.

ORDER: The appeal is dismissed.

**Irving A. Appleman, Member, Dissenting:**

This applicant is a native and citizen of Mexico, admitted to the United States for permanent residence at Chicago on April 4, 1972. His visa was issued on the basis of a marriage to a United States citizen on December 4, 1971. On August 5, 1972 he instituted an uncontested divorce action against his United States citizen wife; and on February 17, 1973 he departed to Mexico. Judgement in the divorce action was entered in his favor on March 6, 1973. In Mexico he proceeded to San Juan de Gracia, Michoacan, south of Mexico City, and while there married Guadalupe on February 26, 1973.[1]

In March 1973 [2] he went to the United States Consul in Guadalajara, Mexico to attempt to secure a tourist visa for his Mexican spouse. At that time the United States consul took his Form I-151 (alien registration and reentry permit) from him and sent it to the United States immigration authorities at Laredo. On March 26, 1974, pursuant to a letter of appointment received from the immigration authorities, he presented himself at Laredo and sought admission as a returning resi-

---

[1] It will be noted that this was prior to the entry of the final divorce decree in Illinois; this is not relevant to the decision in the case.

[2] Either March 4 (Tr. p.66), or March 26 (Tr. p.26).

dent alien to resume his permanent residence in this country. These exclusion hearings ensued, since it appeared that his admission for permanent residence on April 4, 1972 might have been unlawful. Initially he was not represented, but when the complexity of the case and lack of understanding of the applicant became apparent, the immigration judge, most commendably, directed an adjournment to permit the alien to obtain counsel. The hearing thereafter was resumed with counsel.

The applicant first met his United States citizen spouse in 1969 while she was visiting in Mexico. He renewed the acquaintance in Chicago in October 1969; they "went steady" for a period of time, and were married, as noted, on December 4, 1971. At the time, he was living at the home of his spouse and her mother. There is conflicting evidence as to the length of time that he continued to live with her after the marriage ceremony. The divorce decree states that on December 20, 1971, 16 days after the marriage, his wife left him. A statement taken on March 26, 1974 indicates that he lived with her for six or seven days after they were married (p. 24). He testified (Tr. p. 24) that he lived with her for some 24 days after the marriage.

The divorce complaint alleged that the wife refused to consummate the marriage. He testified that they did have sexual relations, but that he was working a night shift, that his wife did not like his way of life and did not wish to stay with him, and that after the marriage she was rarely home. While they were separated he "begged" her to live with him (Tr. p.31), they went camping together, and would eat together. He was living close by and was almost continuously at the mother's house (Tr. pp. 29-32). They were separated at the time he obtained his visa and entered, but he continued his efforts at reconciliation for some time after his admission, until eventually, by mutual agreement, since he had the necessary funds and she did not, he instituted the divorce action.

Concerning his departure to Mexico on February 17, 1973, he took a two month vacation from his job, and left behind a bank account, his clothes, his radio, and everything he owned including some miscellaneous furniture. During his absence he sent money to pay a part of the rent for an apartment he had shared with his brother. His employment in Chicago is still available to him and he is seeking to enter to resume it.

The immigration judge found that the Government had satisfactorily established that at the time the applicant secured his immigration visa in 1972, there was no "viable" marriage in existence; that he was not eligible for the visa which he had obtained as the spouse of a United States citizen; and that consequently his entry for permanent residence was unlawful and he is not entitled to admission as a lawfully returning resident alien. In view of this finding, no determination was made whether the applicant had abandoned permanent residence in the

United States subsequent to his departure in 1973. The majority has affirmed.

This case presents several significant issues. Initially, while neither the decision below nor the majority decision discusses the point, it appears that the case is properly held in exclusion, rather than in expulsion proceedings. In view of the duration of the alien's absence from the United States, and the distance traveled, it cannot be found that his case is governed by the rule laid down in *Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963). Consequently, the issue presented in *Maldonado-Sandoval* v. *INS*, 518 F.2d 278 (C.A. 9, 1975), and *Matter of Castillo-Pineda*, Interim Decision No. 2374 (BIA 1975) is not present here. (See *Matter of Leal*, Interim Decision No. 2439 (BIA 1975)).

The major issue presented is whether or not the Government has satisfactorily met the burden of proof laid down by *Matter of Kane*, Interim Decision No. 2371, and *Chew* v. *Colding*, 344 U.S. 590 (1953). The "viable" marriage concept was enunciated in the framework of a visa petition proceeding in which a petitioner carries the burden of proving that he has a marriage in existence which can be recognized under the immigration laws, and that the grant of his application will serve the purpose of joining together a family unit.[3] This, on the other hand, is an exclusion proceeding in which, because the applicant has shown his prior admission for permanent residence, the Government's burden is not dissimilar to that of a deportation case.

It is not alleged, nor has it been shown, that the marriage in 1971 was invalid at its inception. On the contrary, the immigration judge found otherwise, and the majority decision affirms that finding. The United States citizen petitioner satisfied the Immigration and Naturalization Service that there was a "viable" marriage at the time that her visa petition for this alien was approved. This marriage was not terminated until March 6, 1973, 15 months after its celebration, and 11 months after he entered the United States. It was not terminated by an annulment, so as to give rise to the issue of retroactivity *ab initio* presented in *Matter of Samedi*, 14 I. & N. Dec. 625 (BIA 1974), and *Matter of Castillo-Pineda*, *supra*, but was ended by divorce.

There is evidence that the marriage was consummated, and that the parties lived together for a substantial period of time prior to separation. The findings of an uncontested divorce decree are not determinative in this connection. See *Matter of F—*, 9 I. & N. Dec. 684 (BIA 1962); See also *Karayannis* v. *Brownell* (D.C. Cir., 1957) 251 F.2d 882. It will be noted in any event, that while the decree finds nonconsummation, it also finds that the citizen spouse left the applicant and was responsible

---

[3] Even in visa petition proceedings the definition of "viability" is a matter of varying interpretation, see *e.g. Bark* v. *INS*, 511 F.2d 1200 (C.A. 9, 1975).

for the disruption of the marriage. The circumstances of the marriage were such as could reasonably be expected to cause marital difficulties. The citizen spouse was only 17, some 14 years younger than the applicant. He worked on a night shift, obviously a disruptive element to a new marriage. He has testified to a lack of funds at the time the marriage was celebrated. The citizen spouse was not called as a witness and the applicant's testimony is uncontradicted that he made repeated efforts at reconciliation after his entry.

The judge's findings concerning credibility are normally entitled to great weight. At times the testimony of the applicant was quite confused, as noted by the judge. However, the applicant is far from the most literate person, as evidenced by his inability to read even in Spanish without assistance (Tr. pp. 32, 37, 42). Counsel noted for the record the alien's general lack of intelligence, (Tr. p. 71) and this is borne out by many of his answers, which, by their unresponsiveness, evidence a lack of understanding of the question rather than an intent to deceive. For example, he testified repeatedly at the outset of the hearing that he was entering simultaneously "to visit" and to resume his employment in Chicago—answers which were inconsistent on their face. A good deal of the confusion in his testimony occurred during the earlier part of the hearing when he did not have counsel present. The immigration judge clearly recognized the alien's confusion when he adjourned to allow an opportunity to obtain counsel. The Government's case rests entirely on the alien's own testimony, which has now been found credible in the part which renders him excludable, and not credible as to his explanation of what occurred. Under the circumstances the finding as to lack of credibility must be treated with reservation, particularly in the absence of any countervailing evidence whatsoever, except the divorce decree.

For the purpose of this proceeding the validity of the marriage must be determined as of the time of entry. If valid then, the entry was lawful. One cannot escape the conclusion, from examination of this record, that, had the alien been successful in his efforts to effect a reconciliation after his entry we would not have these proceedings today. It is possible that the majority decision rests to a degree on hindsight. That the marriage ended in divorce does not mean that it was invalid at the time of entry.

There is a limit to the extent to which there may be an administrative challenge to the validity of a marriage duly celebrated and consummated, and in my opinion that limit has been exceeded here. Whatever license may exist for the Service to scrutinize the "viability" of a marriage in processing a visa petition, cannot extend to nonrecognition of a marriage, duly celebrated, valid in its inception, consummated, in existence over a year, recognized as valid by the Government at the time of

the alien's admission, and terminated by divorce, under the circumstances presented in this case.

*Matter of Gonzalez-Portillo,* 13 I. & N. Dec. 309 (BIA 1969), is a much closer case in that it was contended there that the alien had obtained his visa by fraud because prior to his application for a visa his citizen wife had told him she intended to terminate the marriage and he had ceased to reside with her. The finding in *Matter of Gonzalez-Portillo* has equal applicability here,—

> . . . we doubt that Congress, when it enacted the waiver provisions in section 212 (a)(14), intended that this bounty should be rescinded and become unavailable to an alien spouse of a United States citizen who at the time of entry had reason to believe that he would be successful in reviving a floundering marriage which, according to the evidence before us, appears to be contracted in good faith *and which had subsisted until shortly before his departure* to obtain a special immigration visa. . . . It is our position that the fact that the respondent was unsuccessful in resuming marital relations with his wife after entry should not retroactively affect his status with regard to the labor certification requirement at the time of entry since it is the time of entry which controls, *Matter of Paco,* 12 I. & N. Dec. 599 (BIA 1968). [Emphasis added.]

Like the applicant, *Gonzalez-Portillo* had a marriage valid in its inception, was separated from his spouse when he got his visa, and was unsuccessful in reviving the floundering marriage. Even assuming the applicability of the "viable" concept in this proceeding, *Matter of Gonzalez-Portillo* is either dispositive of the issue of "viability", or must be overruled. One can find no rational basis for distinction. This record is a long, long way from establishing that the marriage was hopelessly and irretrievably "dead" at the time the applicant entered. The Government has not met its burden of establishing that the alien either perpetrated a fraud when he entered in 1972, or that he was inadmissible at that time for lack of a valid labor certification, or a valid visa.

If the applicant is held to have obtained lawful permanent residence in 1972, it must then be determined whether he abandoned his residence during his extended absence. This raises a grave question concerning the reason for the duration of his absence. There is clear evidence he had no intention of abandoning when he left. He took steps to retain residence even while abroad. Within approximately a month after leaving the United States he was making efforts to bring his new spouse to this country. The record is silent as to why the United States counsul took away his Form I–151 in March of 1973, or why he was not summoned to hearing in connection with the matter until over a year later. If the delay was occasioned by his own actions, then there is reason to believe he may have abandoned his residence, and even if lawfully admitted in 1972, he would not be admissible today. On the other hand, if the delay was brought about by circumstances outside of his control, and by possibly *ultra vires* actions of Government officials, it is a different

matter entirely. This aspect of the case was not explored, apparently because of the charges and findings below. The case should be remanded for a full exploration and a determination as to whether or not he did in fact abandon his lawful residence in this country.